**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HATIKVAH INTERNATIONAL ACADEMY CHARTER SCHOOL <br>       Plaintiff (Respondent Below), <br><br> v. <br><br> EAST BRUNSWICK TOWNSHIP BOARD OF EDUCATION (Petitioner Below) and A.K. and R.K. on behalf of H.K. (Respondents Below), a minor <br><br>       Defendants. | ON APPEAL FROM AN ORDER GRANTING EMERGENT RELIEF BY SUSAN L. OLGIATI, A.L.J. <br><br> Civil Action No. |

---

**MEMORANDUM OF LAW ON BEHALF OF PLAINTIFF HATIKVAH INTERNATIONAL ACADEMY CHARTER SCHOOL IN SUPPORT OF APPLICATION FOR INJUNCTIVE RELIEF**

---

**JOHNSTON LAW FIRM LLC**
Thomas O. Johnston, Esq. (ID# 040061998)
Barbara J. Bohi, Esq. on the brief (ID# 025401988)
Rula A. Moor, Esq. on the brief (ID# 010252006)
151 Forest Avenue, Suite A
Montclair, NJ 07042
(973) 447-4610
tjohnston@johnstonlawfirmllc.com

Attorneys for Plaintiff Hatikvah International Academy Charter School

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 2

STATEMENT OF FACTS AND RELEVANT PROCEDURAL HISTORY................................................ 5

LEGAL ARGUMENT ...........................................................................................................10

I.      THE COURT SHOULD ISSUE AN AUTOMATIC INJUNCTION TO COMPEL EAST BRUNSWICK TO
PAY H.K.'S STAY -PUT COSTS AT THE LAUREL SCHOOL PURSUANT TO MANDATES UNDER N.J.S.A.
18A:36A-11(B) AND THE IDEA.............................................................................................10

II.     NOTWITHSTANDING STAY-PUT'S AUTOMATIC INJUNCTION, ALTERNATIVELY THE COURT
SHOULD ENTER A PRELIMINARY INJUNCTION AND VACATE JUDGE OLGIATI'S ORDER BECAUSE THE
ELEMENTS OF A PRELIMINARY INJUNCTION ARE MET.........................................................12

          A.Hatikvah Is Threatened with Irreparable Harm in the Absence of a Preliminary
Injunction..................................................................................................................... 13

          B. Hatikvah Has a Substantial Likelihood of Success on the Merits ............................ 16

          1. Judge Olgiati Misapplied the Act and the IDEA.......................................................16

          2. Judge Olgiati's "illusory" Rationale Contradicts Well-Settled Precedent on Stay-Put
          Rights.....................................................................................................................20

          3.      Judge Olgiati's Order Contradicts the Plain Meeting of the Act...................................26

          4.      East Brunswick is Judicially Estopped from Disavowing Its Stay-Put Obligations During
                  the Pendency of this Matter..................................................................................29

          5.      East Brunswick Must Provide H.K. Transportation to and from the Laurel School
          Pursuant to State Law.................................................................................................30

          6.      East Brunswick is Time Barred from Challenging a Private School Placement for
          H.K.............................................................................................................................32

          7.      East Brunswick is Barred from Challenging the Laurel School Placement on Waiver and
          Equitable Grounds......................................................................................................34

          C.      The Balancing of the Equities and the Public Interest Weighs in Favor of
          Granting Hatikvah's Requested Preliminary
          Injunction....................................................................................................................38

CONCLUSION....................................................................................................................40

## **TABLE OF AUTHORITIES**

## Cases

*A.D. v. Haw Dept of Educ.*, 727 F3d 911, 913 (9th Cir. 2013) ......................................................................26

*Allis-Chalmers Mfg. Co. v. White Consol. Indus.*, 414 F.2d 506 (3d Cir. 1969)............................................18

*Altice USA, Inc. v. N.J. Bd. of Pub. Util.*, 2020 U.S. Dist. LEXIS 10433 (D.N.J. Jan. 22, 2020) .......................16

*Amoco Production Co.*, 480 U.S., 531 546, n. 12 (1987).......................................................................19, 41

*AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994), cert. denied, 514 U.S. 1103 (1995) ........................................................................................................................................15

*Chase Manhattan Bank v. Josephson*, 135 N.J. 209 (1994) ......................................................................27

*Concerned Parents v. N.Y. City Bd. of Educ.*, 629 F.2d 751, 756 (2d Cir. 1980) ..........................................35

*Craster v. Board of Comm'rs*, 9 N.J. 225, 230 (1952)..........................................................................29, 30

*Cummings v. Bahr*, 295 N.J. Super. 374, 385-87 (App. Div. 1996)...............................................................33

*D.C. v. Masucci,* 13 F.Supp. 3d 33 (D.D.C. 2014) .....................................................................................16

*Drinker by Drinker v. Colonial Sch. District*, 78 F3d 859, 865 (3d Cir. 1996) ...................................13, 14, 27

*E.M.,* 2011 U.S. Dist. LEXIS 16502 at *19-20 .................................................................................30, 31, 34

*East Orange Bd. of Educ. v. E.M.*, 2011 U.S. Dist. LEXIS 16502, Civil No. 08-4778 (SRC)(D.N.J. Feb. 17, 2011) ...............................................................................................................................30, 31, 34

*Ferren C v. Sch. Dist. of Phil.*, 612 F.3d 712, 717 (3d Cir. 2010) ................................................................35

*Hirsch v. Amper Fin. Servs.*, LLC, 215 N.J. 174 (2013) ..............................................................................38

*Honig v. Doe,* 484 U.S. 305, 326 *(1988)*..........................................................................................13, 14

*In re Englewood on Palisades Charter School,* 164 N.J. 316, 332 (1999)......................................................30

*In re Plan for the Abolition of the Council on Affordable Hous.*, 214 N.J. 444, 467 (2013).........................29

*In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015)...............................................................................19

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).......................................16

*Kaprow v. Berkeley Tp. Bd. Of Educ.*, 131 N.J. 572, 583 ...........................................................................36

ii

*Kimball Int'l, Inc. v. Northfield Metal Prods.*, 334 *N.J. Super.* 596, 606 (App. Div. 2000), *certif. denied*, 167 *N.J.* 88 (2001) ........................................................................................................................................33

*Knorr v. Smeal*, 178 N.J. 169, 177 (2003).........................................................................................................38, 39

*L.M. v. Evesham Twp. Bd. of Educ.,* 256 F.Supp. 2d 290, 294-95 (D.N.J. 2003)...........................................13

*L.Y. ex rel. J.Y. v. Bayonne BOE*, 2011 U.S. Dist. LEXIS 32952, * 17 (D.N.J. March 29, 2011) ...............22, 36

*L.Y. v. Bayonne Bd. of Educ.*, 2010 U.S. App. LEXIS 11920*7 (3d Cir. 2010) .........................................passim

*Lavin v. Bd. of Educ. of the City of Hackensack*, 90 N.J. 145, 152, 447 A.2d 516 (1982)..............................39

*M.R. v. Ridley*, 744 F.3d 112, 128 (3d Cir. 2014)............................................................................... 16, 25, 26

*Merchs. Indem. Corp. of N.Y. v. Eggleston*, 68 N.J. Super. 235, 254 (App.Div.1961), aff'd, 37 N.J. 114, 179 A.2d 505 (1962)...........................................................................................................................................38

*Millburn Twp BOE v. M.P.,* 2016 U.S. Dist. LEXIS 8541*22 (D.N.J. Jan. 26, 2016)........................................16

*Miller v. Miller*, 97 N.J. 154, 163 (1984) .........................................................................................................39

*Morales v. Morales*, No. A-1280-13T1, 2015 N.J. Super. Unpub. LEXIS 160, at *7-9 (Super. Ct. App. Div. Jan. 26, 2015) .................................................................................................................................................39

*North Jersey Media Group, Inc*. 451 N.J. Super. at 303 ..............................................................................29

*Pa. v. Pres. of the United States*, 930 F.3d 543, 574 (3d Cir. 2019) ............................................................16

*Pennsylvania v. President of the U.S.*, 930 F.3d 543, 465 (3d. Cir. 2019) ..............................................19, 41

*Ridley II*, 2012 U.S. Dist. LEXIS 113600, 2012 WL 3279230, at *13 .............................................................26

*Scarano v. Cent. R.R. Co. of N.J.*, 203 F.2d 510, 513 (3d Cir. 1953) .............................................................33

*School Comm. of the Town of Burlington v. Department of Educ.*, 471 U.S. 359 (1985 ........................26, 34

*Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011)............................................19

*State v. Regis,* 208 N.J. 439 (2011) .................................................................................................................29

*Susquenita Sch. Dist. V. Raelee S. ex rel. Heidi S.*, 96 F.3d 78, 81 (3d Cir. 1996) ...................................16, 26

*Sussex Commons Assocs.*, LLC, 210 N.J. at 541.............................................................................................29

*T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009) .................................................................35

*Thomas v. Cincinnati BOE*, 918 F.2d 618, 625-26 (6th Cir. 1990) ................................................................28

*Trump v. Intern. Refugee Project,* 137 S. Ct. 2080, 2087 (2017 ..................................................................41

*W. Jersey Title & Guar. Co. v. Indus. Trust Co.*, 27 N.J. 144, 152 (1958) ......................................................38

*Winter v. Natural Resources Defense Council, Inc*, 555 U.S. 7 (2008) ...................................................15, 41

*Woods v. New Jersey Dep't of Educ.*, No. 93-5123, 20 Indiv. Disabilities Educ. L. Rep. 439, 440 (3d Cir. Sept. 17, 1993) ..........................................................................................................................................14

*Zvi D. by Shirley D. v. Ambach, 694 F.2d 904, 906 (2d Cir. 1982)* ...............................................................13

## Statutes, Regulations and Rules

20 U.S.C §1415(j) .......................................................................................................................................6

20 U.S.C. §§1412(a)(11) .............................................................................................................................13

34 C.F.R. §300.515 .....................................................................................................................................13

*N.J.A.C.* 6A:11-4.1 .....................................................................................................................................20

*N.J.A.C.* 6A:14-3.7 (a) ................................................................................................................................24

*N.J.A.C.* 6A:23A-15.4 ...................................................................................................................8, 12, 21, 22

*N.J.A.C.* 6A:27-3.1 .....................................................................................................................................35

*N.J.A.C.* 6A:3.1(d) .....................................................................................................................................35

*N.J.S.A.* 1:1-1 ...........................................................................................................................................30

*N.J.S.A.* 18A:36A-11(b) ........................................................................................................................passim

*N.J.S.A.* 18A:36A-13 .................................................................................................................................34

*N.J.S.A.* 18A:36A-17 .................................................................................................................................19

*N.J.S.A.* 18A:36A-2 ...................................................................................................................................20

*N.J.S.A.* 18A:36A-9 ...................................................................................................................................20

N.J.S.A. 18A:39-1 .......................................................................................................................................35

*N.J.S.A.* 18A:75A-3 ...................................................................................................................................21

## Other Authorities

Black's Law Dictionary, 6th Ed., 1990 ........................................................................................................ 23

*U.S.D.O.E. Comments*, 71 Fed. Reg. at 46687 (Aug. 14, 2006) ..................................................................... 35

## PRELIMINARY STATEMENT

This matter arises out of a dispute between a resident district board of education ("resident district") on one side, and a charter school and parents of a disabled child on the other side, concerning the application of "stay-put" pendency rights under the Individuals with Disabilities Education Act ("IDEA") and the New Jersey Charter School Program Act (the "Act.") The student is H.K.  He is in Fourth Grade at a private school and has reading and attention deficits, with oppositional tendencies and developmental delays.   He is enrolled at Hatikvah International Academy Charter School ("Hatikvah").  He resides in East Brunswick School District ("East Brunswick").

An emergency has arisen from an order entered by Hon. Susan L. Olgiati, A.L.J.,[1] which places on Hatikvah unredressable burdens and threatens H.K.'s and his parents' stay-put rights. The order undermines well settled stay-put principles under 20 U.S.C §1415(j) and contradicts the plain meaning of the Act's fiscal responsibility mandates about private school costs.

After H.K.'s parents settled an administrative due process matter[2] against Hatikvah and East Brunswick on October 28, 2019, East Brunswick filed a challenge on November 27, 2019 to the agreed upon placement for H.K. at the Laurel School, a private accredited school. But East Brunswick had not previously objected or otherwise challenged a private school placement prior to then, including on the very day the settlement for that placement was entered on the record

---

[1] The present matter is captioned before the Office of Administrative Law as *East Brunswick Board of Education v. A.K. and R.K. o/b/o H.K.* and *Hatikvah Intern. Academy Charter School*, Dkt No. EDS 16805-19.

[2] *A.K. and R.K. o/b/o H.K. v. East Brunswick Board of Education* and *Hatikvah International Academy Charter School*, Dkt No. EDS 16374-18 ("*A.K.*" matter).

before Hon. Jeffrey Rabin, A.L.J.   When East Brunswick filed a challenge, it did not even identify nor know of an alternative program for H.K. in its district.

*N.J.S.A.* 18A:36A-11(b) places unconditional "fiscal responsibility" for a charter school student's private school costs on the resident district, except that the resident district may "challenge" the placement.   All parties agree that, during the pendency of East Brunswick's challenge, the Laurel School is H.K.'s stay-put placement.

On October 21, 2019, in another due process matter against Hatikvah, East Brunswick acknowledged that fiscal responsibility for stay-put costs. Yet, since East Brunswick filed its challenge, it has refused to pay for Laurel School costs.   On January 21, 2020, H.K.'s parents filed an emergent motion before Judge Olgiati for an order directing H.K.'s stay-put placement at the Laurel School and to compel funding for same on a pendency basis.

Judge Olgiati issued an order on February 6, 2020, which contained numerous errors of law and poses a threat to Hatikvah and H.K.   She disregarded the plain meaning of *N.J.S.A.* 18A:36A-11(b) and directed that Hatikvah pay for H.K.'s stay-put costs.   To cure the incongruities she created from her re-write of the law, she had to craft numerous reimbursement systems between Hatikvah and East Brunswick which have no legal support.   She conditioned East Brunswick's fiscal responsibility on it first being able to exhaust its challenge to the private school placement, which, as East Brunswick admits, can take "several academic years."   Because Judge Olgiati erroneously applied the IDEA's stay-put mandate, Hatikvah is entitled to an "automatic injunction" pursuant to 20 U.S.C. §1415(j).

Notwithstanding the Court's authority to enter an automatic injunction, the elements for the entry of a preliminary injunction in Hatikvah's favor are also met.   Hatikvah is threatened with

3

having to pay private school costs for which the New Jersey Legislature specifically exempted charter schools. As a matter of law, a school district cannot recover stay-put costs if it ultimately prevails in an underlying due process matter. Beyond that, Judge Olgiati's order upsets the funding scheme set by the Legislature between resident districts and charter schools. Hatikvah is not funded to absorb private school stay-put costs over several years. Being compelled to do so will all but eliminate its budget surplus, compromise its mission and threaten its very viability.

Hatikvah has a substantial likelihood of prevailing on the merits. Hatikvah has closely followed *N.J.S.A.* 18A:36A-11(b) and its implementing regulation at *N.J.A.C.* 6A:23A-15.4. Both place exclusive fiscal responsibility for a charter school student's private school costs on his or her resident district. East Brunswick is time barred and/or equitably barred from challenging a placement at a private school. If a preliminary injunction is entered, all that will happen is that the Legislature's decision on private school funding for charter school students will be carried out; the stay-put principles of never putting a school district's fiscal interests ahead of a student's stay-put rights will be preserved. East Brunswick will bear costs for which it is funded to absorb.

If a preliminary injunction is not entered, Hatikvah will suffer irreparable harm because it cannot recover stay-put costs as a matter of law. H.K. is threatened with disenrollment from the Laurel School. East Brunswick's sharp tactic of filing a late private school placement challenge without even deciding on a program alternative in-district to skirt fiscal responsibility will be rewarded. All New Jersey resident school districts will then challenge private school placements of charter school students, irrespective of their merits, to avoid or forestall stay-put costs for several academic years. So either a charter school will confront debilitating fiscal obligations it is not funded to absorb, or a student will have delayed a move to an appropriate program and

4

remain in an inappropriate one to accommodate a stay-put waiting requirement. A new stay-put funding exemption to *N.J.S.A.* 18A:36A-11(b), crafted by Judge Olgiati, will swallow the rule.

Accordingly, the Court should enter a preliminary injunction vacating Judge Olgiati's order and compelling East Brunswick to pay for all stay-put costs at the Laurel School during the pendency of this matter.

## STATEMENT OF FACTS AND RELEVANT PROCEDURAL HISTORY

Hatikvah provides H.K. services as the federally designated local education agency ("LEA"). H.K. has been diagnosed with severe reading language deficits, attention deficit hyperactivity disorder with oppositional tendencies and developmental delays in fine motor and speech skills. (*See* Verified Complaint, dated March 4, 2020, Ex. A at pp 3-7.)

In or about September 2018, H.K.'s parents unilaterally placed him at the Laurel School. On September 20, 2018, Hatikvah convened an IEP meeting. East Brunswick representatives attended. Hatikvah proposed a placement for H.K.'s program "a private state-approved school for students with language-based learning disabilities, namely the Bridge Academy School . . .", a private school in Lawrenceville, New Jersey. Hatikvah served the East Brunswick representatives a copy of the Bridge Academy IEP at the meeting. (*See* Certification of Marcia Grayson., dated January 28, 2020 Ex. A at p. 1.) That IEP would "result in a private day or residential placement" as described in *N.J.S.A.* 18A:36A-11(b).

By letter dated September 27, 2018, H.K.'s parents filed a due process matter ("*AK*" matter), challenging the Bridge Academy IEP and seeking reimbursement from Hatikvah for Laurel School costs, among other remedies. The petitioner also named East Brunswick as respondent. (*See* Verified Complaint at ¶ 10.)

5

East Brunswick's counsel, Jodi Howlett, participated in the *A.K.* proceedings. (*See* Verified Complaint, Ex. B.)  But at the time of the first two hearing dates, she did not, nor did anyone else, appear on behalf of East Brunswick. (*See* Verified Complaint, Ex. C at p.4.)  East Brunswick did not move for its dismissal from the matter or otherwise seek to withdraw from the *A.K.* matter. East Brunswick consequently retained all the prerogatives of a party in a due process hearing, such as receiving notices and opportunities to appear and be heard. (*See* Verified Complaint at ¶ 12.)  Hon. Jeffrey Rabin, A.L.J. was appointed as judge in *A.K.*

The first two hearing dates in *A.K.* occurred on September 25 and October 7, 2019.  The third hearing date occurred on October 28, 2019.  East Brunswick's Director of Special Services, Renee Davis, and Ms. Howlett appeared at the Office of Administrative Law that day in another matter. (*See* Verified Complaint, Ex. C at p. 39-40.)  As of October 28, 2019, East Brunswick had not objected or otherwise challenged H.K.'s placement by Hatikvah at a private school. (*See id.* at ¶ 13.)

H.K.'s parents and Hatikvah reached a settlement on the record before Judge Rabin.  The settlement called for H.K.'s IEP placement location to change to the Laurel School.  The settlement further entailed a reimbursement of monies to H.K.'s parents related to their out of pocket costs from the Laurel School, incurred through that date.  Hatikvah's counsel noted that under *N.J.S.A.* 18A:36A-11(b), the fiscal responsibility for the H.K. placement is on East Brunswick. (*See* Verified Complaint,  Ex. C at p. 29.)  Judge Rabin approved the placement at the Laurel School.

Ms. Howlett appeared in the hearing room during the entry of the settlement on the record.  She identified herself as counsel to East Brunswick.  She did not object or reserve any

6

rights to object to the placement; about the Laurel School IEP or any other aspect of the settlement. (*See* Verified Complaint, Ex. C at p. T26, 39, 40.) If she had, Hatikvah's Director, Dr. Marcia Grayson, would have considered any such objection in deciding the terms of the settlement or whether to settle at all. (*See* Grayson Certif., at ¶ 6.)

On November 27, 2019, East Brunswick filed a petition for due process before the New Jersey Department of Education Office of Special Education Programs to challenge the placement at the Laurel School. (*See* Verified Complaint, Ex. D.) On January 21, 2020, H.K.'s parents filed an emergent motion seeking an order to compel East Brunswick or Hatikvah to pay for the Laurel School costs on a pendency basis. The matter was assigned to Hon. Susan Olgiati, ALJ.

Judge Olgiati convened a conference call with counsel on the record on January 30, 2020. Although East Brunswick had filed for due process, East Brunswick's counsel admitted that East Brunswick has not "gotten to that point yet" of being able to present an alternative program in its district. (*See* Verified Complaint, Ex. E. Tr11:7-10.) "We don't have all of that information yet . . ." (*See id.*, Tr13:5-8.)

By letters dated January 16, 2020 and January 30, 2020 , the Laurel School threatened H.K.'s disenrollment unless it was paid for his attendance there. (*See* Verified Complaint, Ex. F.)

After hearing oral argument on February 4, 2020, Judge Olgiati issued a decision on February 6, 2020. (*See* Verified Complaint, Ex. G.) She ordered that Hatikvah pay for the Laurel School tuition costs during the pendency of this matter. She cited no legal authorities which require a charter school to pay for pendency costs at a disputed private school. She further ordered that East Brunswick transport H.K. to and from the Laurel School, but that East Brunswick bill Hatikvah for those costs on a pendency basis. She cited to no authorities which support such

7

a reimbursement system.  Lastly, she stated in the Order that Hatikvah "may seek" reimbursement from East Brunswick if East Brunswick is unsuccessful in the underlying due process matter.  She cited to no legal authorities to support such a right to reimbursement, nor did she affirm a right at all of Hatikvah to receive reimbursement; merely to "seek" reimbursement. (*See id*., Ex. G at p. 10.)

Judge Olgiati stated that "neither N.J.S.A. 18A:36A-11(b) and N.J.A.C. 6A:23A-15.4 nor any special education regulation, squarely resolves the question as to which party – the school district or the charter school – should bear the costs of a stay-put placement where, as here, the private school placement was agreed to by the parents and the charter school and implemented before the school district exercised its right under N.J.S.A. 18A:36A-11(b) and N.J.A.C. 6A:23A-15.4." (*See id.*, Ex. G at p. 7.)  But she did not explain why the plain meaning of the Act and regulation do not already cover stay-put costs, as it places unconditional "fiscal" responsibility on the resident district.

Judge Olgiati found that if "a district does not have an opportunity to object before the child is moved, a charter school must pay for the placement it implemented pending resolution of the due process petition." (See *id.*, Ex. G. at p. 8.)   Although East Brunswick received notice of a private school placement on September 20, 2018, and participated in the *A.K.* proceedings, including the entry of the settlement on the record, without objecting to the placement, Judge Olgiati found that "Hatikvah and the parents effectively dictated H.K.'s placement without affording the District the opportunity to exercise its right under N.J.S.A. 18A:36A-11(b), to object to the placement before H.K. was moved." (*See id.*) (emphasis added.)

As for whether East Brunswick was time-barred from challenging a private school placement, Judge Olgiati found that East Brunswick's "decision not to challenge a prior proposed IEP which was never implemented, does not bar its right to timely challenge the current IEP and placement." (*See id.*, Ex G at p. 9.) She cited to no legal authority for such a "before implementation" condition; nor does she explain why it does not contradict her other finding that a resident district should be given a chance to challenge a placement before implementation of the private school placement.

Judge Olgiati scheduled hearing dates on the merits for April 20, 2020 and July 8, 2020.[3] (*See* Verified Complaint at ¶ 26.)

Hatikvah herein moves for the entry of a preliminary injunction, ordering that Judge Olgiati's February 6, 2020 Order Granting Emergency Relief be vacated; that the Laurel School be the stay-put placement during the pendency of this matter; and that East Brunswick pay for all costs associated therewith, including tuition and transportation.

---

[3] By letter dated May 6, 2019, the United States Department of Education found that the State Department of Education and Office of Administrative Law violated IDEA mandates with respect to concluding due process hearings within 45-days. (*See* Verified Complaint, Ex. H.) The USDOE found that New Jersey "does not have procedures for ensuring that decision in due process hearings are issued within the 45-day timeline or within allowable extensions . . ." and that the NJDOE "failed to exercise its general supervisory and monitoring responsibility in 20 U.S.C. §§1412(a)(11) and 1416(a) . . to ensure that due process hearing decision are issued within the 45-day timeline or within an allowable extension, as required by 34 C.F.R. §300.515(a) and (c). (*See id.* p. 2.) Indeed here, the second hearing date is not scheduled until July 8, 2020, 224 days from the date of East Brunswick's filing and 190 days from the transmission of the matter to the Office of Administrative Law.

9

## LEGAL ARGUMENT

**I.  THE COURT SHOULD ISSUE AN AUTOMATIC INJUNCTION TO COMPEL EAST BRUNSWICK TO PAY H.K.'S STAY-PUT COSTS AT THE LAUREL SCHOOL PURSUANT TO MANDATES UNDER N.J.S.A. 18A:36A-11(b) AND THE IDEA**

In reviewing legal decisions by an Administrative Law Judge, this Court will apply a *de novo* standard of review. *L.M. v. Evesham Twp. Bd. of Educ.,* 256 F.Supp. 2d 290, 294-95 (D.N.J. 2003).

Section 1415(j) of the IDEA provides that:

> [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child . . . .

This provision, known as the "stay-put provision," imposes an "automatic" statutory injunction. *Honig v. Doe,* 484 U.S. 305, 326 *(1988).*   A child is to remain in their "then-current educational placement" during the "pendency of any proceedings conducted pursuant to [IDEA]." *Id.* This portion of IDEA refers to both the services and funding included in the placement, mandating that "a school district continues to finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing." *Drinker by Drinker v. Colonial Sch. District*, 78 F3d 859, 865 (3d Cir. 1996)(quoting *Zvi D. by Shirley D. v. Ambach, 694 F.2d 904, 906 (2d Cir. 1982)).* The "stay-put" provision acts as "an automatic preliminary injunction," barring schools from making changes to a disabled student's education without parental consent. *Drinker, 78 F.3d at 864.* The fact that IDEA applies this injunction automatically, and does not consider "the usual prerequisites of injunctive relief" such as "whether [the parent's] case is meritorious or not," demonstrates the high priority that

10

Congress intended to give to the continuity of student services under IDEA. *Id.* (quoting *Woods v. New Jersey Dep't of Educ.*, No. 93-5123, 20 Indiv. Disabilities Educ. L. Rep. 439, 440 (3d Cir. Sept. 17, 1993)). The Supreme Court has noted that this protection is "unequivocal" with the purpose of "strip[ping] schools of the unilateral authority they had traditionally employed to exclude disabled students . . . from school." *Drinker, 78 F.3d 859, 864 (3d Cir. 1996)* (emphasis in original) (quoting *Honig v. Doe,* 484 U.S. 305, 323 (1988)).

Thus, here, the Court has authority to enter a stay-put order and vacate Judge Olgiati's Order without having to find the elements normally required for a preliminary injunction. Although the error by Judge Olgiati addressed the funding of stay-put costs, the error is centered on the application of stay-put rights, which are reviewable by this Court without having to undergo a traditional preliminary injunction analysis. *See Honig, 484 U.S. at 326.* For the reasons described below with respect to the merits of Hatikvah's stay-put arguments, Hatikvah is entitled to a corrected stay-put order.

The Third Circuit held that "the current educational placement refers to the operative placement actually functioning at the time the dispute first arises. If an IEP has been implemented, then that program's placement will be the one subject to the stay-put provision. " *Drinker,* 78 F.3d at 867; *L.Y. v. Bayonne Bd. of Educ.*, 2010 U.S. App. LEXIS 11920*7 (3d Cir. 2010)(internal citations omitted)(emphasis added).

That Judge Olgiati's Order related to funding stay-put costs does not make her decision any less detrimental to parents of disabled children. The Order allows a resident district to shift to the charter school fiscal responsibilities for stay-put costs by merely filing a challenge. The Order's clear command to charter schools is that, if it wants to avoid a funding obligation not

11

supported nor contemplated by the Act, it must delay the timely implementation of an IEP to afford the resident district time to decide whether to challenge the IEP. Then if the resident district files for due process, the child will be caught in a program under stay-put which no party; the parents, charter school nor resident district, believe is appropriate for the child. This State-sanctioned deprivation of an appropriate public education would arise out of a resident district's desire to save money. It turns the IDEA and stay-put policies on their head.[4]

## II.   NOTWITHSTANDING STAY-PUT'S AUTOMATIC INJUNCTION, ALTERNATIVELY THE COURT SHOULD ENTER A PRELIMINARY INJUNCTION AND VACATE JUDGE OLGIATI'S ORDER BECAUSE THE ELEMENTS OF A PRELIMINARY INJUNCTION ARE MET

Even if the Court is not inclined to enter an "automatic injunction" on the merits of the parties' stay-put rights, Hatikvah can otherwise demonstrate an entitlement to a preliminary injunction. When considering whether to stay an administrative decision or to issue a preliminary injunction, the court must balance four factors: (1) the likelihood that the moving party will prevail on the merits of its claim (appeal); (2) the likelihood that it will suffer irreparable harm if the preliminary injunction (stay) is not granted; (3) the prospect that granting the injunction (stay) will result in substantial harm to other interested persons; and (4) the public interest in granting the injunction (stay). *AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994), cert. denied, 514 U.S. 1103 (1995); *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982) (en banc). In *Winter v. Natural Resources Defense Council, Inc*, 555 U.S. 7 (2008), the Supreme Court described the balancing test for whether a preliminary injunction is appropriate. A court needs to examine whether the plaintiff is likely to succeed on the merits,

---

[4] As described below, on October 21, 2019, even East Brunswick itself described this outcome as "reprehensible" in another special education matter. (*See* Verified Complaint, Ex. K at p. 4.)

12

whether the plaintiff is likely to suffer irreparable harm without the injunction, whether the balance of equities and hardships is in the plaintiff's favor, and whether an injunction is in the public interest. *Id*. at 20.

## A. Hatikvah Is Threatened with Irreparable Harm in the Absence of a Preliminary Injunction

Irreparable harm means that the harm is not capable of remedy by money damages at a later date, in the ordinary course of litigation. *Instant Air Freight Co. v. C.F. Air Freight, Inc*., 882 F.2d 797, 801 (3d Cir. 1989). The Third Circuit has found a school district's inability to recover stay-put costs were irreparable harm. *Susquenita Sch. Dist. V. Raelee S. ex rel. Heidi S*., 96 F.3d 78, 81 (3d Cir. 1996); *see also Millburn Twp BOE v. M.P.,* 2016 U.S. Dist. LEXIS 8541*22 (D.N.J. Jan. 26, 2016)(citing *D.C. v. Masucci,* 13 F.Supp. 3d 33 (D.D.C. 2014). "While monetary consequences are usually insufficient to constitute irreparable harm (because they can be reimbursed), the same is not true of 'unredressable financial consequences.'" *Altice USA, Inc. v. N.J. Bd. of Pub. Util*., 2020 U.S. Dist. LEXIS 10433 (D.N.J. Jan. 22, 2020) quoting *Pa. v. Pres. of the United States*, 930 F.3d 543, 574 (3d Cir. 2019). "[F]inancial consequences" are "unredressable" when the law prohibits the party seeking the injunction from recouping the value of those financial consequences via damages from its opponents in the litigation. *See id.* at 575.

A school system's payment of stay-put costs is a burden the IDEA places on the responsible school district, which are not reimbursable as a matter of law. *M.R. v. Ridley*, 744 F.3d 112, 128 (3d Cir. 2014). Judge Olgiati's crafting a remedy that allows a charter school to merely "seek" reimbursement from East Brunswick, was not supported by any legal authorities. Because there is no legal basis for Hatikvah to obtain reimbursement for the Laurel School's stay-

13

put costs, Hatikvah is threatened with irreparable harm in the absence of a preliminary injunction.

Moreover, charter schools are required to carry out their unique missions. (*See* Verified Complaint, Ex. I.) Hatikvah's mission is to deliver "in-depth study of Modern Hebrew delivered in part using the model of the International Baccalaureate curriculum." (See Verified Complaint at ¶ 43; Ex M. at p. 1.) The Hebrew/English immersion component at Hatikvah requires staffing not present in a traditional school district.

Hatikvah's funding per student over the prior 4 years has been flat or decreased, while having to absorb rising costs year to year. Its current fiscal year budget surplus is only $80,853. Its cash on hand can support only 42 days of operation. Hatikvah's per student payment for East Brunswick residents is only 83 % of East Brunswick's per student funding ($13,292/$15,986). See Grayson Certif., at ¶ 7, Ex. B.)

Hatikvah's general fund budget for this year is $6,256,074. Adding to these constraints a mandate to fund stay-put costs over multiple school years will necessitate reducing staff. (See Verified Complaint at ¶ 43.) Yet, Hatikvah's multi-language charter mission requires that it have adequate staff who can deliver that program.   The reduction of staff has a certain but unquantifiable negative impact on instruction.   Paying for H.K.'s costs on a pendency basis would cost over $70,000 per year, which would all but eliminate Hatikvah's budget surplus this year. East Brunswick on the other hand, has a general fund budget equal to $156,988,488 for the 2020-2021 school year. Its budget's unrestricted fund balance is projected to be $3,131,266 at the end of            this            school            year.                              See *https://www.ebnet.org/cms/lib/NJ01911729/Centricity/Domain/109/FY2020%20User%20Frien*

14

*dly%20Budget%20-%20Tentative.pdf* p. 8 of 53, accessed on March 2, 2020. It retains more than $500,000 for monies attributable to its residents attending Hatikvah.

The Act's allocation of private school costs reflects the Legislature's determination on the respective funding between charter school and resident districts. Charter schools' existence are indefinite by nature. A renewed charter school terms is no more than 5 years. *N.J.S.A.* 18A:36A-17. Charter schools are always subject to closure by the Commissioner. *N.J.S.A.* 18A:36A-17.1. Judge Olgiati's rewriting private school funding is not only contrary to the Act, it places an acute pecuniary strain on a much smaller school system to such an extent that it threatens Hatikvah's mission and continuing viability. *See Allis-Chalmers Mfg. Co. v. White Consol. Indus.*, 414 F.2d 506 (3d Cir. 1969)(threat to company viability constitute irreparable harm.)

Moreover, H.K. is threatened with irreparable harm. The Laurel School is threatening H.K.'s removal for nonpayment of tuition. Also, the school district's fiscal responsibility for costs once stay-put is determined is unconditional. East Brunswick has acknowledged that a pendency period may take "several academic years." (*See* Verified Complaint, Ex. K at p. 4.) Judge Olgiati injects into stay-put jurisprudence a concept rejected years ago – that a resident district's ability to challenge a disputed program obviates the need for it to pay for stay-put costs. Thus, should a charter school close, its enrolled student attending a private school will have no meaningful stay-put rights if it should have a dispute with the successor LEA, such as the resident district, since the resident district is excused from stay-put costs under Judge Olgiati's order. This incongruity cannot be dealt with yet another rewrite of the Act by an administrative law judge.

The Court should enter a preliminary injunction and vacate Judge Olgiati's order to avoid irreparable harm to Hatikvah.

### B. Hatikvah Has a Substantial Likelihood of Success on the Merits

To establish a likelihood of success, "a sufficient degree of success for a strong showing exists if there is 'a reasonable chance, or probability, of winning.'" *Pennsylvania v. President of the U.S.*, 930 F.3d 543, 465 (3d. Cir. 2019)citing *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc)). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success"). *See Amoco Production Co.*, 480 U.S., 531 546, n. 12 (1987).

#### 1.   Judge Olgiati Misapplied the Act and the IDEA

The Legislature adopted the Act in 1995 to advance policies of educational innovation, accountability and parent empowerment. *N.J.S.A.* 18A:36A-2. Public monies follow the student to a charter school, although the charter school does not receive the entire per student funding from a resident school district. It instead receives a fractional share each school year. For example, for the 2019-2020 school year, Hatikvah receives 83% of East Brunswick's per student funding for East Brunswick-resident students attending Hatikvah. East Brunswick will retain in the 2019-2020 school year $551,447 in monies attributable to Hatikvah students. (*See* Verified Complaint at ¶ 43; Grayson Certif. at p. 2, Ex. B.)

"The admissions policy of the charter school shall, to the maximum extent practicable, seek the enrollment of a cross section of the community's school age population including racial and academic factors." *N.J.S.A.* 18A:36A-9. Charter schools are local education agencies ("LEAs") under the Act and special education laws. *See N.J.A.C.* 6A:11-4.1 and *N.J.S.A.* 18A:36A-11(b). "'Local education agency' means a public authority legally constituted by the state as an

16

administrative agency to provide control of and direction for Kindergarten through Twelfth grade

public educational institutions." *N.J.S.A.* 18A:75A-3.   A charter school has the case management

and program formulation obligations even if the student attends a program outside the charter

school.

The local resident district of residence on the other hand is fiscally responsible for private

school placement costs:

> A charter school shall comply with the provisions of chapter 46
> [N.J.S.18A:46-1 et seq.] of Title 18A of the New Jersey Statutes
> concerning the provision of services to students with disabilities;
> except that the fiscal responsibility for any student currently
> enrolled in or determined to require a private day or residential
> school shall remain with the district of residence.

*N.J.S.A.* 18A:36A-11(b)(emphasis added).   Effective January 13, 2008, the Act also provides that:

> Within 15 days of the signing of the individualized education plan,
> a charter school shall provide notice to the resident district of any
> individualized education plan which results in a private day or
> residential placement. The resident district may challenge **the**
> **placement** within 30 days in accordance with the procedures
> established by law.

*Id.* (emphasis added)(emphasis added).

The implementing regulation provides as follows:

> The due process hearing shall be limited in scope to a
> determination by an administrative law judge as to whether there
> is a less-restrictive placement that will meet the student's
> educational needs and, if so, whether the charter school must place
> the student in the program

*N.J.A.C.* 6A:23A-15.4(b).   The regulations further provide:

"The resident district may challenge the placement within 30 days in accordance with

the procedures established by law." *N.J.S.A.* 18A:36A-11(b); *N.J.A.C.* 6A:23A-15.4(b).

17

1.   The request for a due process hearing shall be processed in accordance with N.J.A.C. 6A:14-2.7 and, if the parties agree, mediation will be offered prior to transmittal of the matter to the Office of Administrative Law for a due process hearing.

2. For purposes of administering the request for a due process hearing, the school **district of residence shall be considered the 'school district**' as the term is utilized in N.J.A.C. 6A:14-2.7 and the request shall be processed in accordance with the regulations applicable to requests for a due process hearing by a school district.

3. All procedural issues that arise with respect to filings by a school district of residence for a due process hearing in accordance with N.J.A.C. 6A:14-2.7 shall be addressed by the administrative law judge assigned to hear the matter.

4. If the due process petition is resolved with a determination that the student must be placed in the less-restrictive program sought by the school district of residence, the student shall still be considered a student enrolled in the charter school who has been placed in the program by the charter school. The charter school shall maintain the student's slot in its enrollment and provide all child study team services for the student, including the development of an IEP and the monitoring of the implementation of the student's IEPs.

*N.J.A.C.* 6A:23A-15.4(b)(1)-(4)(emphasis added).

The regulation explicitly places on a challenging resident district the responsibilities associated with school districts in due process hearings, including stay-put obligations. The "district of resident shall be considered the 'school district" as that term is utilized in *N.J.A.C.* 6A:14-2.7," in due process hearings. *N.J.A.C.* 6A:23A-15.4(b)(2). *N.J.A.C.* 6A:14-2.7 places on the "school district" party stay-put obligations:

> Pending the outcome of a due process hearing, including an expedited due process hearing, or any administrative or judicial proceeding, no change shall be made to the student's classification, program or placement unless both parties agree, or emergency

18

> relief as part of a request for a due process hearing is granted by
> the Office of Administrative Law according to (m) above or as
> provided in 20 U.S.C. § 1415(k) as amended and supplemented.

*N.J.A.C.* 6A:14-2.7 (u).

Thus, the Act and regulations explicitly require that the resident district abide by a

student's stay-put rights.  The Act and regulations place no fiscal responsibility on the charter

school during a stay-put period or any other period of a charter student's enrollment in a private

school.  This broad scope of that fiscal responsibility was disregarded by Judge Olgiati when she

found that the Act does not address stay-put fiscal responsibilities merely because it does not

explicitly reference stay-put fiscal responsibilities.

United States District Court Judge Stanley R. Chesler interpreted  the Act:

> [I]n a due process challenge, the resident school district is
> prohibited from disputing whether a child is in fact disabled, the
> development for the IEP, or the nature of the special services
> determined by the IEP team.  The N.J.S.A. 18A:36A-11(b) merely
> provides a district of residence with an opportunity to demonstrate
> that it can provide the educational placement that was
> determinate by the IEP team, in-district.  In the event that an
> administrative law judge determines a less restrictive placement
> will meet the student's educational needs, the charter school
> continues to provide all study team services for the student,
> including the development of an IEP and the monitoring of its
> implementation.

*L.Y. ex rel. J.Y. v. Bayonne BOE*, 2011 U.S. Dist. LEXIS 32952, * 17 (D.N.J. March 29, 2011).  The

Court of Appeals for the Third Circuit affirmed this rationale.  *L.Y. v. Bayonne BOE*, 542 Fed. Appx.

139, 2013 U.S. App. LEXIS 22632*142 (3d Circ. Oct. 7, 2013). [5]

_____

[5] *L.Y.* is not precedential.  The Third Circuit wrote "only for the parties" in that matter.  *L.Y.*, 384 Fed Appx. at p. 58.  "Not precedential" means it has value only to the trial court or the specific parties as opposed to the general public or future litigants (3d Cir. Internal Operating Procedures 5.3; *see Cooper Univ. Hosp. v.*

The Act and regulation also do not reference a waiting period, whereby the IEP cannot change a placement until a resident district has a chance to challenge it.    If the Legislature intended that it could have specified that in the legislation.   Instead, "[a]n IEP shall be in effect before special education and related services are provided to a student with a disability and such IEP shall be implemented as soon as possible following the IEP meeting." *N.J.A.C.* 6A:14-3.7 (a).

## 2.   Judge Olgiati's "Illusory" Rationale Contradicts Well Settled Precedent on Stay-Put Rights

The Act gives a resident district meaningful relief upon prevailing in a challenge. Until 2008, the resident district was not allowed to challenge any charter school students' private placement even though the resident district paid for the tuition costs.    Effective 2008, if a resident district prevails, then it will have terminated its private school funding obligation, which will inure to the resident district's fiscal benefit for potentially years into the future.   By way of illustration:

---

*Sebelius*, 636 F.3d 44 (3d Cir. 2010)). Not precedential decisions are not binding precedent and may be cited only as persuasive authority (3d Cir. I.O.P. 5.3; 3d Cir. I.O.P. 5.7). The Third Circuit does not cite to its not precedential opinions as authority (3d Cir. I.O.P. 5.7).

## H.K.'s Estimated Costs of the Laurel School

| Grade | Tuition | Transportation |
|-------|---------|----------------|
| 5 | 42,000 | 30,000 |
| 6 | 42,000 | 30,000 |
| 7 | 42,000 | 30,000 |
| 8 | 42,000 | 30,000 |
| 9 | 42,000 | 30,000 |
| 10 | 42,000 | 30,000 |
| 11 | 42,000 | 30,000 |
| 12 | 42,000 [6] | 30,000 |
|  | 336,000 | 240,000 |
| Total |  | 576,000 |

If East Brunswick prevails here, presuming a decision this summer, it will have cut off its funding responsibilities beyond grade 4, and achieve more than $500,000 in savings. Judge Olgiati ignored this meaningful value, when she reasoned that Hatikvah and H.K.'s parents should have afforded East Brunswick a chance to object to the Laurel School placement "before H.K. was moved" and that requiring East Brunswick to fund stay-put costs when making a challenge would make its rights under *N.J.S.A.* 18A:36A-11(b) "illusory." (*See* Verified Complaint, Ex. G at p. 7-8.)

East Brunswick can challenge the private school placement. It if prevails it will unquestionably be conferred value. It was not for Judge Olgiati to second guess the Legislature's judgment on that value. "Illusory" means deceiving by false appearances; nominal, as distinguished from substantial. Black's Law Dictionary, 6th Ed., 1990. As noted above, a successful challenge by a resident district to a private school placement has hundreds of thousands of dollars or more at stake.

---

[6] The Laurel School's current annual tuition rate is $42,000. Chart reflects conservative assumption of no rate increases in future years. Transportation rate based on conservative assumption and a single-student bus.

Beyond that, Judge Olgiati's "illusory" rationale also contradicts well settled precedent on stay-put rights under the IDEA. The prospect of a school district having to pay for stay-put costs for a placement it is simultaneously challenging is not inconsistent with the IDEA's polices, but rather in furtherance of them.    In *M.R. v. Ridely Sch. District*, 744 F.3d 112 (3d Cir. 2014), the parents of a disabled rising second grade student unilaterally placed the student in a private school.    They filed an administrative action with the Pennsylvania Department of Education claiming that the school district did not offer M.R. an appropriate IEP and sought reimbursements for the private school costs. The parents prevailed before the hearing officer. The school district appealed. The United States District Court reversed the hearing officer's placement assessment, finding that M.R.'s proposed IEP was adequate. The Third Circuit affirmed the District Court's decision. The school district refused to pay for the private school costs during the pendency of the appeals, since it had prevailed in its challenge to the private school. M.R's parents filed a claim to compel the local district to pay for the private school costs until "all appeals had concluded." *Id.* at 116.

The Third Circuit in *M.R.* noted that the child's pendent placement became the private school upon the hearing officer's determination. *Id.* at 119. (Here, there is no dispute that the Laurel School is the pendent placement per the charter school and parents' determination.) The local school district argued that it "was inappropriate . . . to award reimbursement for private schooling that the district court had found unnecessary by the time the request for payment was made." Id. at 120.

But the *M.R.* court noted that resolution of the stay-put placement and "completely separate" from the merits issues in the underling administrative hearing. *Id.* at p. 121, *citing A.D.*

22

*v. Haw Dept of Educ.*, 727 F3d 911, 913 (9th Cir. 2013). Financing "goes hand-in-hand with pendent private-school placement." *M.R.* , 744 F.3d at 123. The "rationale that underlies a school district's obligation to finance a child's pendent placement remains compelling through the appellate process." *Id.* at p. 126:

> Despite two judicial determinations that [the school district] did not deny E.R. a FAPE, the school district will be assessed the cost of her private school education for a substantial period of time. It is impossible, however, to protect a child's educational status quo without sometimes taxing school districts for private education costs that ultimately will be deemed unnecessary by a court. We see this not as 'an absurd result,' . . . but as an unavoidable consequence of the balance Congress struck to ensure stability for a vulnerable group of children.

*Id.* at p. 128 (citing *Ridley II*, 2012 U.S. Dist. LEXIS 113600, 2012 WL 3279230, at *13).

Likewise, in *Susquenita School District*, the Third Circuit held that the school district could be financially responsible for stay-put costs at a private school during the appeal of an agency decision in which it prevailed:

> The pendent placement provision impacts to some degree virtually every case involving an administrative challenge under the IDEA. A child's placement during the course of administrative and judicial proceedings typically has great significance for all concerned. 'Whereas in the present case review of a contested IEP takes years to run its course -- years critical to the child's development -- important practical questions arise concerning interim placement of the child and financial responsibility for that placement.'

Susquenita School Dist., 96 F.3d at 82, citing *School Comm. of the Town of Burlington v. Department of Educ.*, 471 U.S. 359 (1985). "It is undisputed that once there is state agreement with respect to pendent placement, *a fortiori*, financial responsibility on the part of the local school district follows." *Susquenita Sch. District*, 96 F.3d at p. 84.

23

Thus, there is nothing improper in requiring a school district contesting its obligation to pay for private school costs to pay for such costs on a pendency basis. The ability of that school district to challenge the placement is not "illusory."

When applying a statute, a court presumes that the Legislature is familiar with existing judicial interpretations of the laws. *Chase Manhattan Bank v. Josephson*, 135 N.J. 209 (1994). IDEA stay-put costs were known by the Legislature. It was not for Judge Olgiati to reallocate fiscal responsibilities for private school costs on a charter school.

Judge Olgiati' relies on L.Y. for the proposition that "the charter school and the mother cannot dictate placement at the private school over the Board's objections and reasoned that the 'IDEA's stay-put provisions should be read in harmony with [N.J.S.A. 18A:36A-11(b), which permits a school district to object to a placement before a child is moved." (See Verified Complaint, Ex. G at 7-8) citing *L.Y.* at 63. First, L.Y. is not precedential. Beyond that, the *L.Y.* court was responding to the charter school and parents' arguments that it could re-write the IEP even after the filing of a challenge to change the stay-put placement. *L.Y.*'s stay-put determination rested entirely on its finding that, unlike here, the private school program was not "actually functioning" at the time the challenge was filed, since it was filed during the summer months before the IEP's implementation. *Drinker,* 78 F.3d at 867. Here there is no dispute that the Laurel School is the stay-put placement per Hatikvah and H.K.'s parents' agreement. The Third Circuit in *L.Y.* simply applied the Act to determine the stay-put placement. The decision would have had a different outcome if the dispute arose after IEP implementation. "If an IEP has been implemented, then that program's placement will be the one subject to the stay-put provision. If no IEP is in effect when the dispute arises, the stay-put placement is that under

24

which the child is actually receiving instruction at the time the dispute arises. Id." *L.Y. v. Bayonne Bd. of Educ.*, 2010 U.S. App. LEXIS 11920\*7 (3d Cir. 2010)(citing *Thomas v. Cincinnati BOE*, 918 F.2d 618, 625-26 (6th Cir. 1990)).

Judge Olgiati places great emphasis on the charter school and the parents "dictating" to East Brunswick a private school placement.   But the Act and regulations do not give nor contemplate a resident district having local education agency responsibilities to formulate a charter school students' IEP. *See N.J.S.A.* 18A:36A-11(b).   Hatikvah and H.K.'s parents simply followed the law, yet Judge Olgiati faults them for not including East Brunswick in the decision-making based on her erroneous perceptions of how the process should work.

Judge Olgiati conflated Hatikvah's LEA responsibilities with stay-put fiscal responsibilities. The United States Court of Appeals, Third Circuit described the shared but distinct responsibilities between the resident district and charter school over a charter school student's private placement:

> Under New Jersey law, when a disabled student attends a charter school, that school is responsible for providing special education to that student, including working with the child's parents to develop an IEP . . . The resident school district where the child resides, however, bears fiscal responsibility for a child's special education services when the IEP requires placement at a private school.

*L.Y. v. Bayonne Bd. of Educ.,* 384 Fed Appx. 58 (3d Cir. 2010).   The Third Circuit described the fiscal responsibility being exclusively on the resident district:

> Exercising its statutory right to contest the [private school] placement because it is responsible for paying the requisite tuition, Bayonne [resident district] initiated a due process hearing with the Department of Education, claiming that an in-district school placement would provide J.Y. with a free and appropriate public

25

> education in the least restrictive environment among non-disabled
> children.

*Id.* at 60 (emphasis added). The Third Circuit applied the Act's mandate that the resident district is responsible for private school costs. There is no reference in the Act, in *L.Y.*, or any other case, to the charter school being responsible for private school costs. The resident district "is" responsible. *Id.* Judge Olgiati applied the Act to mean that the resident district "may" be responsible if it does not prevail ultimately in a challenge after several years. Judge Olgiati's exception swallows the rule about resident districts being fiscally responsible for such private school costs.

### 3.    Judge Olgiati's Order Contradicts the Plain Meaning of the Act

It is a judge's role to first "look at the plain language of the statute" because it is "typically the best indicator of intent." *Id.* citing *Sussex Commons Assocs.*, LLC, 210 N.J. at 541; *In re Plan for the Abolition of the Council on Affordable Hous.*, 214 N.J. 444, 467 (2013). Courts read and construe the words and phrases of the statute "with their context," giving them "their generally accepted meaning, according to the approved usage of the language," "unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated." *North Jersey Media Group, Inc.* 451 N.J. Super. at 303, quoting *N.J.S.A.* 1:1-1; *State v. Regis,* 208 N.J. 439 (2011). As the New Jersey Supreme Court stated, the "court should not write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment." *Craster v. Board of Comm'rs*, 9 N.J. 225, 230 (1952)(court declining to read into the plain meaning of a law a prohibition over electing pension benefits because "no intention is manifested in the wording" of the relevant statutes).

26

Here, Judge Olgiati added multiple conditions to resident districts being fiscally responsible for a charter school student's private school costs which are not in the Act or regulations. According to Judge Olgiati, a charter school must pay for stay-put costs; or institute a waiting period to afford the resident district a chance to file a challenge. The Legislature was "pointedly omitted" in putting these conditions in the Act. "[N]o intention is manifested in the wording" of the Act for that. *Craster*, 9 N.J. at p. 230. To cure an incongruity from Judge Olgiati's re-write of the Act, she added another qualification, without citation to any authorities, that Hatikvah "may seek" reimbursement from East Brunswick should East Brunswick not prevail. Judge Olgiati notably does not affirm that a reimbursement right in law exists, because it does not under the law. Judge Olgiati could have simply applied the Act as written and required the East Brunswick abide by its "fiscal" responsibility under the Act.

The funding scheme was carefully devised by the Legislature, as described in *In re Englewood on Palisades Charter School*, 164 N.J. 316, 332 (1999)(regarding legislative deliberation on charter school and resident district's respective funding). East Brunswick retains over a half million dollars of funds each year attributable to Hatikvah students it does not educate. Hatikvah is not funded to bear the costs East Brunswick is seeking to place on Hatikvah.

The *East Orange Bd. of Educ. v. E.M.*, 2011 U.S. Dist. LEXIS 16502, Civil No. 08-4778 (SRC)(D.N.J. Feb. 17, 2011) case is instructive. There, the charter school student was originally placed at a private school while residing in Newark District. Upon moving to East Orange, the student remained enrolled in the charter school and attended the private school. But the East Orange District contested its fiscal responsibility for the private school. Like here, East Orange argued that it did not participate in the private school placement decision and that it could serve

27

the student in its district. "While the [East Orange] District was required to bear the cost of J.B.'s education under the IDEA after he became a resident, it refused to pay for his 'then-current educational placement.'" *Id.* at *17.

While the stay-put injunction application issues in that matter became moot when the student relocated out-of-state, Judge Chesler's decision on reimbursement for parent costs during the stay-put period confirms that costs associated with a private school placement are exclusively on the resident district during the stay-put period. Judge Chesler ordered that East Orange District reimburse the parents for transportation costs (the parents had not paid the private school tuition costs). Nowhere is there reference to the charter school being responsible for any private school or other costs.

> As the [East Orange] Board was the resident district of a disabled child subject to the stay-put provision, the Board was responsible for these expenses.

*E.M.*, at *18 (emphasis added).

Likewise, here, because East Brunswick is the resident district of H.K. and is subject to the stay-put provision, East Brunswick is responsible for the Laurel School costs. *Id.* Judge Olgiati distinguished *E.M.* since the parents there filed suit initially. But that is of no moment, since there was no bar to East Orange commencing a challenge. Judge Olgiati also erroneously asserted that, at the time the dispute arose, the resident district was unable to challenge a private school placement since the Act's amendment permitting challenges became effective January 13, 2008. Put another way, Judge Olgiati's substituted her analysis over Judge Chesler's analysis, since Judge Chesler did not rest his decision on that basis. Beyond that, the resident district indeed could have challenged the private placement since the hearing had not yet commenced

at the time of the Act's amendment and the parties considered amendments to the petition. The ALJ in E.M. issued her decision on June 17, 2008. The ALJ indeed analyzed in her decision the rights of East Orange District to file a challenge and made no finding of the district being time barred. *See* ALJ Decision, filed herewith, at p. 8 and 10 of 12.

## 4.   East Brunswick is Judicially Estopped from Disavowing Its Stay-Put Obligations During the Pendency of this Matter

Judge Olgiati omits from her decision that on October 21, 2019 East Brunswick agreed about the mandatory and immediate nature of its fiscal responsibility to pay for a private placement of a charter school student, even upon its challenge. In another case involving East Brunswick, Hatikvah and a private school placement, East Brunswick replied to Administrative Law Judge Patricia Caliguire's inquiry about why East Brunswick signed the private school tuition contract without explicitly "reserving rights" even though it was challenging the placement:

> [I]f the Board refused to execute the tuition agreement with Bridge Academy, it is foreseeable that Bridge would terminate B.A.'s attendance. It would be reprehensible for the Board to impede the provision of educational programming and services to B.A. (albeit not in the least restrictive environment) while it challenges Hatikvah's placement – especially in light of Hatikvah's acknowledgement that it is unable to provide B.A. with FAPE. This is akin to the concept of 'stay-put,' wherein a student is entitled to remain in his 'then current educational placement' for the pendency of a due process proceeding. Moreover, as the Court is aware, the adjudication of a due process petition may extend over several academic years. The Legislature could not possibly have intended to keep a disabled student from receiving any measure of appropriate services while a resident district and a charter school dispute whether the placement provides FAPE in the least restrictive environment; nor should a [private school] be required to forego tuition until the parties' financial responsibility is eventually determined.

29

(*See* Verified Complaint, Ex K at p. 4, in the matter *East Brunswick BOE v. I.A. et al., OAL Dkt* No. EDS 17692-18, (hereinafter "*B.A.*" matter)).   East Brunswick acknowledged that, while *N.J.S.A.* 18A:36A-11(b) gives East Brunswick the right to file a challenge to a private school placement, it cannot be on the back of a disabled child's stay-put rights.  In *B.A.*, East Brunswick never looked to Hatikvah to pay for stay-put costs over a disputed private school placement.

East Brunswick turns an about-face in this matter.  It is judicially estopped from arguing against its fiscal obligations to fund the Laurel School on a stay-put basis.  "It is the integrity of the judicial process that is protected by the doctrine of judicial estoppel. Parties should not be allowed 'to play fast and loose' with the judicial system." *Cummings v. Bahr*, 295 N.J. Super. 374, 385-87 (App. Div. 1996).  It is well settled that "a party to litigation will not be permitted to assume inconsistent or mutually contradictory positions with respect to the same matter in the same or a successive series of suits." *Scarano v. Cent. R.R. Co. of N.J.*, 203 F.2d 510, 513 (3d Cir. 1953); *Cummings v. Bahr*, 295 *N.J. Super.* 374, 385 (App. Div. 1996); *Kimball Int'l, Inc. v. Northfield Metal Prods.*, 334 *N.J. Super.* 596, 606 (App. Div. 2000), *certif. denied*, 167 *N.J.* 88 (2001).  At the time of the October 28, 2019 settlement being entered into the record, East Brunswick stated its stay-put position in the *B.A.* matter, which was made on October 21, 2019.  East Brunswick made that position known to Hatikvah.  It notably did not change it prior to and during the entry of the settlement on the record.

### 5.    East Brunswick Must Provide H.K. Transportation to and from the Laurel School Pursuant to State Law

Irrespective of East Brunswick's' stay-put obligations, as a resident district, it must provide H.K. transportation to and from the Laurel School since it provides transportation for its students who have transportation as a related service in their IEP.  *See N.J.S.A.* 18A:36A-13 and *N.J.A.C.*

6A:3.1(d)("Charter or renaissance school students who reside in the school district or region of residence in which the charter or renaissance school is located shall be provided with transportation in the same manner as transportation is provided to other public school students residing within the school district in which the charter or renaissance school students reside."); (*see also* Verified Complaint, Ex. J, *Charter and Renaissance School Transportation Procedures,* NJ DOE, September 2014 ("The district in which the student resides shall provide transportation or aid in lieu of transportation to eligible charter and renaissance school students in accordance with N.J.S.A. 18A:39-1 and N.J.A.C. 6A:27-3.1."( *See id.* at p. 1; "Special education students are also eligible for transportation services as specified by the student's individual education plan (IEP)." (*See id.* at p. 2.)

Moreover, per the *East Orange* decision, because H.K. has transportation as a related service in his IEP, the Act also requires that East Brunswick provide H.K. transportation on a stay-put basis. *E.M.,* 2011 U.S. Dist. LEXIS 16502 at *19-20. Judge Olgiati, in placing transportation costs on Hatikvah, put East Brunswick is a better position than the student transportation laws require. Whether a private or public placement, the charter school student's resident district provides transportation. *N.J.A.C.* 6A:3.1(d). In another example of having to cure the incongruities in her legislative re-write of the Act, Judge Olgiati crafted a reimbursement system, without citation to any authorities, whereby East Brunswick would transport the student and bill the charter school.[7]

---

[7] While the IDEA authorizes hearing officers to grant equitable remedies, such remedies are intended to provide relief to parents to further IDEA policies, like reimbursement for unilaterally procured costs after the district fails its IDEA obligations. *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374 (1985); "Furthering the purposes of the IDEA serves as the guiding principle in fashioning equitable relief." *Ferren C v. Sch. Dist. of Phil.*, 612 F.3d 712, 717 (3d Cir.

The Court should Order that East Brunswick transport H.K. to and from the Laurel School

at its expense during the pendency of this matter.

### 6.    East Brunswick is Time-Barred from Challenging a Private School Placement for H.K.

Both the Act and relevant regulations set a 30 days' time limitation period for a resident

district to challenge a charter school student's placement at a private school.

> Within 15 days of the signing of the individualized education plan, a charter school shall provide notice to the resident district of any individualized education plan which results in a private day or residential placement. The resident district may challenge the **placement** within 30 days in accordance with the procedures established by law

*N.J.S.A.* 18A:36A-11(b).   "Placement" does not mean the school's location, but rather the

program of services.   The term "educational placement" in the regulations "refers only to the

general type of educational program in which the child is placed." *Concerned Parents v. N.Y. City*

*Bd. of Educ.*, 629 F.2d 751, 756 (2d Cir. 1980). "Educational placement" refers to the general

educational program--such as the classes, individualized attention and additional services a child

will receive--rather than the "bricks and mortar" of the specific school. *T.Y. v. N.Y. City Dep't of*

*Educ.*, 584 F.3d 412, 419 (2d Cir. 2009). "Educational placement" within the meaning of the IDEA

refers to the provision of special education and related services rather than a specific place, such

as a specific classroom  or specific school. *See U.S.D.O.E. Comments*, 71 Fed. Reg. at 46687 (Aug.

---

2010).   In contrast, Judge Olgiati's crafting of reimbursement systems are intended to cure the problems with her application of the State law's fiscal mandates between charter school and resident districts.

14, 2006); *see also Concerned Parents & Citizens for the Continuing Educ. at Malcom X (PS 79) v. New York City Bd. of Educ., 629 F.2d 751, 753 (2d Cir. 1980).*

Judge Olgiati conflated the term "IEP" with "placement."    The terms have distinct meanings. In *L.Y.*, Judge Chesler found that the private school could be construed as the same "placement" as a program offered by Bayonne in-district. *L.Y. ex rel. J.Y. v. Bayonne School District,* 2011 U.S. Dist. LEXIS 32952.

Here, the time for East Brunswick to file a challenge was upon being given notice of an IEP which called for a private school "placement." The private school "placement" did not change from the September 20, 2018 IEP to the Laurel School IEP. Both describe "general type of education programs" located at private schools "for students with language-based learning disabilities," with "specialized multi-sensory phonemic awareness instruction" and "behavior supports" to address H.K.'s "attention, hyperactivity and oppositional behaviors." (*See* Grayson Certif., Ex. A Sept. 20, 2018 IEP at p. 1 and 16; and Verified Complaint, Ex. A at p. 13, 17.)

The first instance in which Hatikvah placed East Brunswick on notice of "an individualized education plan which results in a private day or residential placement" was on September 20, 2018. *N.J.S.A.* 18A:36A-11(b). East Brunswick was a respondent in the due process petition filed by H.K.'s parents to contest the Bridge Academy School location. Bridge Academy and Laurel School are mere brick and mortar schools for the same educational "placement."

Limitation periods are particularly important in education matters. *See Kaprow v. Berkeley Tp. Bd. Of Educ.,* 131 N.J. 572, 583 (finding that limitation periods under school laws "provides finality in education matters"). The shortened 30-day limitation period set by the Legislature in *N.J.S.A.* 18A:36A-11(b) is explained by the urgent need to bring certainty to a

33

disabled child's program.   Both the September 20, 2018 IEP and Laurel School IEP had higher fiscal consequences to East Brunswick beyond ordinary charter school funding, the type which N.J.S.A. 18A:36-11(b) was designed give resident districts leave to challenge.   Because East Brunswick did not challenge the private school placement within 30 days in 2018, it is time-barred from challenging it now.

Judge Olgiati reasoned that it was of no moment that East Brunswick did not challenge the September 20, 2018 IEP because it had not yet been implemented. But N.J.S.A. 18A:36A-11(b) and its regulation does not contain an implementation condition.   This rationale also contradicts Judge Olgiati's reasoning that a charter school and parents cannot "dictate" private school costs on a resident district before the resident district has a challenge to complete its challenge. The time to challenge H.K.'s private school program expired on October 20, 2018 – 30 days from the September 20, 2018 IEP notice.   East Brunswick is time-barred from challenging the Laurel School.

## 7.   East Brunswick is Barred from Challenging the Laurel School Placement on Waiver and Equitable Grounds

East Brunswick participated in the A.K. matter. It purposefully opted not to appear on the first two hearing dates, nor to file a challenge to the September 20, 2018 IEP.   It then had its counsel appear during the entry of the settlement on the record; the very same settlement which called for the Laurel School placement it challenges now.   Even then it did not object to the placement.   If it had, Hatikvah would have reconsidered the settlement.   Just weeks earlier East Brunswick described in a filing that it would be "reprehensible" for it to "impede" implementation of a private school placement during the pendency of a challenge. (See Verified

34

Complaint, Ex. K at p. 4.)   Relying on East Brunswick's lack of objection, Hatikvah proceeded with the settlement.

It is now clear that East Brunswick's nonappearance at the hearings was tactical.  By not taking a position on a private school placement, it sought to lessen its jeopardy in the A.K. matter, while retaining the prerogatives of a party in the matter.  Only when Hatikvah and the parents settled on the private school, after an intensely disputed case through that date, did East Brunswick file a challenge.  Even then it was 30 days later.

It is well settled that a waiver is the voluntary and intentional relinquishment of a known right. W. Jersey Title & Guar. Co. v. Indus. Trust Co., 27 N.J. 144, 152 (1958).    An effective waiver requires a party to have full knowledge of his legal rights and intent to surrender those rights. Id. at 153.  The intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference. Knorr v. Smeal, 178 N.J. 169, 177 (2003), citing Merchs. Indem. Corp. of N.Y. v. Eggleston, 68 N.J. Super. 235, 254 (App.Div.1961), aff'd, 37 N.J. 114, 179 A.2d 505 (1962).  Here, East Brunswick waived its challenge to H.K.'s private school placement due to its "indifference" in the A.K. matter by not making any attempt to contest the private school placement even though it was a party in the matter.

Moreover, the doctrine of equitable estoppel "is designed to prevent a party's disavowal of previous conduct if such repudiation would not be responsive to the demands of justice and good conscience." Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174 (2013) (internal citation omitted). To establish equitable estoppel, the party seeking to invoke the doctrine must prove that an opposing party "engaged in conduct, either intentionally or under circumstances that

induced reliance, and that [the moving party] acted or changed . . . position to [his or her] detriment." *Knorr, supra*, 178 N.J. at 178 (*citing Miller v. Miller*, 97 N.J. 154, 163 (1984)). Here, East Brunswick's silence in the *A.K.* matter was telling, particularly while the settlement was entered into the record on October 28, 2019. Dr. Grayson relied upon such silence in deciding to settle with H.K.'s parents. East Brunswick is now equitably estopped from challenging the Laurel School placement, lest there be a grievous injustice visited upon H.K., his parents and Hatikvah.

The doctrine of laches is another equitable tool that may be "invoked to deny a party enforcement of a known right when the party engages in an inexcusable and unexplained delay in exercising that right to the prejudice of the other party." *Knorr*, 178 N.J. at 180-81. "Laches may only be enforced when the delaying party had sufficient opportunity to assert the right in the proper forum and the prejudiced party acted in good faith believing that the right had been abandoned." *Id.* at 181. Several factors that have been used in determining whether the doctrine of laches applies are: (1) the length of the delay; (2) the reasons for the delay; and (3) the "changing conditions of either or both parties during the delay." Ibid. (quoting *Lavin v. Bd. of Educ. of the City of Hackensack*, 90 N.J. 145, 152, 447 A.2d 516 (1982)). *Morales v. Morales*, No. A-1280-13T1, 2015 N.J. Super. Unpub. LEXIS 160, at \*7-9 (Super. Ct. App. Div. Jan. 26, 2015).

Here, East Brunswick had "sufficient opportunity" to contest the private school placement in the *A.K.* matter. *Knorr*, 178 N.J. at 180-81. It can offer no good reason for the delay. Its indifference in *A.K.* directly led to Hatikvah's reliance in deciding on the settlement, only to lead to this second phase of litigation. Judge Olgiati approved East Brunswick's tactics and simply concluded that Hatikvah's arguments about its prejudice was "unpersuasive." (*See* Verified Complaint, Ex. G at p. 9.) Judge Olgiati erroneously stated:

36

>Hatikvah and the parents effectively dictated H.K.'s placement without affording the District the opportunity to exercise its right under N.J.S.A. 18A:36A-11(b), to object to the placement before H.K. was moved.

(See Verified Complaint, Ex. G at p. 8).

As noted above, H.K.'s "placement" changed in September 2018 with issuance of the September 2018 IEP. The "brick and mortar" school changed on October 28, 2019. Beyond that, East Brunswick had every opportunity to object to the placement, because it was a party in the *A.K.* case. It had 13 months to object to a private placement. It deployed a sharp tactic of remaining silent on the issue, only to challenge it a month later without a program alternative in mind, while trying to shift interim stay-put costs to Hatikvah.

Accordingly, Hatikvah has a substantial likelihood of success on the merits because East Brunswick's is barred from challenging the Laurel School placement on waiver and equitable grounds.

37

### C. The Balancing of the Equities and the Public Interest Weighs in Favor of Granting Hatikvah's Requested Preliminary Injunction

The purpose of injunctions is "not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Pennsylvania v. President of the U.S.*, 930 F.3d 543, 575 (3d Cir. 2019)(citing *Trump v. Intern. Refugee Project,* 137 S. Ct. 2080, 2087 (2017). "The factors examined . . . -- the balance of equities and consideration of the public interest -- are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Winter v. NRDS, Inc.,* 555 U.S. 7, 32 (2008). *See Amoco Production Co., 480 U.S., at 546, n. 12* ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success").

Here, if a preliminary injunction is entered, all that will happen is the application of the plain meaning of the Act. East Brunswick will be fiscally responsible for stay-put costs  because the Act provides that a resident district has "fiscal responsibility" for private school costs. Stay-put jurisprudence will remain intact.  If a preliminary injunction is not entered, a road map for resident districts will have been written; file  a challenge to a private school placement under the Act to forestall funding, irrespective of whether the resident district in fact has an alternative program which can confer on the student an appropriate public education.  East Brunswick did precisely that here.  To this day, it has not disclosed its program alternative to H.K.'s parents or Hatikvah.  Instead, her counsel admitted on January 30, 2020 that they do not have one yet.   East Brunswick's tactics will be rewarded.

Without a preliminary injunction, *N.J.S.A.* 18A:36A-11(b) will be enforced to protect a

38

resident district's fiscal interests at the cost of a disabled students' IDEA rights. Their parents will be faced with either foregoing a private school placement which can meet the student's needs simply because their child is a charter school student, or succumb to several years' delay during due process proceedings, while their child remains in a program for several years no one believes appropriate.

For example, a behaviorally disabled charter school student on home instruction after failing to have his needs met in a mainstream setting, who is awaiting a private school placement with supports the resident district lacks, should not have to continue home instruction for several academic years to indulge a resident district's desire to save money. If an administrative law judge can absolve a fiscally responsible school district of stay-put costs, it undermines the inviolate mandate that a child's pendency placement not be subject to the financial interests of that district. Judge Olgiati Order will foster more litigation over disabled students' programs by compelling resident districts to always litigate the private school IEP of charter school students to forestall or prevent stay-put fiscal responsibilities. While Judge Olgiati placed focus on her perceived unfairness to a resident district paying for stay-put costs until having a chance to challenge the placement, she expressed no concern about the obvious injustice to a disabled student and charter school from a resident district simply filing a challenge to delay or forestall stay-put costs which may ultimately be unsuccessful.

The foregoing harms cannot simply be avoided by looking to the charter school to fund stay-put costs. Charter schools are not assured continued existence. The Legislature carefully deliberated on and devised the funding scheme for charter schools. Charter school serve public

39

school students and carry out a public mission. It would be extremely improper to place on it fiscal responsibilities simply because one takes a view different from the Legislature about the funding scheme for private schools under the Act.

## CONCLUSION

For the foregoing reasons, the Court should vacate Judge Ogiati's Order Granting Emergency Relief and enter a preliminary injunction against East Brunswick, compelling it to fund the Laurel School placement and transport H.K. during the pendency of this matter.

> Respectfully submitted,
> JOHNSTON LAW FIRM LLC
> Attorneys for Plaintiff
> Hatikvah International Academy Charter School, Inc.
>
> By:
> Thomas O. Johnston

March 4, 2020

40