34 CFR 300.500 to 300.587 the Commissioner of the Department of Education requested that an administrative law judge (ALJ) be assigned to conduct an emergent hearing in this matter. The oral argument was scheduled for June 17 2008 and the Director of the OAL assigned this matter to me pursuant to N.J.S.A. 5214F-5o. "> Link to original

*State of New Jersey*

## OFFICE OF ADMINISTRATIVE LAW

**FINAL DECISION**

**OAL DKT. NO. EDS 12493-07**

**AGENCY DKT. NO. 2008-12948**

**E.M. ON BEHALF OF J.B.,**

    **Petitioner,**

    **v.**

**EAST ORANGE BOARD OF EDUCATION,**

**Respondent.**

_____

    **Esther M. Canty-Barnes, Esq., for petitioner**

    **Robin Ballard, Esq., for respondent (Schwartz, Simon, Edelstein, Celso & Kessler, attorneys)**

**Record Closed: June 17, 2008 Decided: June 26, 2008**

**BEFORE LESLIE Z. CELENTANO, ALJ:**

### STATEMENT OF THE CASE AND PROCEDURAL HISTORY

Petitioner E.M., on behalf of J.B., filed for due process on October 18, 2007 seeking to have her son J.B. remain at North Hudson Academy with transportation. On December 17, 2007, the matter was transmitted to the Office of Administrative Law (OAL) for determination as a contested case pursuant to N.J.S.A. 52:14B-1 to -15 and N.J.S.A. 52:14F-1 to -13. The hearing was scheduled to commence on December 19, 2007, however on that date petitioner produced what purported to be a current individualized education plan (IEP) which had not previously been provided to respondent, and the hearing was suspended following opening remarks by counsel. Petitioner was directed to provide the IEP to respondent, and respondent indicated an intention to file a motion for summary decision. At the same time, petitioner expressed an intention to withdraw the petition and refile it seeking additional relief.

When the matter had not been withdrawn, a conference call was held on April 24, 2008, wherein a briefing schedule was established for the motion to dismiss respondent intended to file. Respondent's motion papers, due

on May 19, 2008, were received on May 16, 2008. Petitioner's reply, due on May 30, 2008, was received on June 9, 2008, and included a cross-motion for summary decision.

## FACTUAL DISCUSSION

*J.B.'s Initial IEP*. The Greater Newark Charter School (GNCS) implemented J.B.'s initial IEP on October 4, 2006. This IEP classified J.B. as specific learning disabled and stated that the program to be implemented would be "in-class support" (R-1 at 1); however, the details of the IEP indicated that J.B. was to be placed in a "Skills Center Program." R-1 at 3. Further, class locations differed depending on subject matter: J.B. was placed in the skill center for reading, language, and math, and was in the regular classroom for social studies, science, and art/music/gym. R-1 at 31. The GNCS website describes the skill center as "a classroom where students receive increased levels of individualized instruction in specific areas." See <http://greaternewarkcharterschool.org/AboutUs.htm>. As such, the program listed on J.B.'s IEP, "in-class support," does not accurately reflect the non-mainstream nature of the skill center. This program's goal "is to allow the student(s) to work toward as many of the regular classroom goals as possible, while adhering to the individualized educational plan outlined in the special education placement process or any other individual needs." Ibid. This program was structured to give J.B. "continued exposure to age appropriate peer relations, while at the same time getting the specialized attention he needs in [the] Skill Center Program for [his] academic weakness." R-1 at 26. As such, a complete reading of the IEP indicates that the program implemented is not simply in-class support, because J.B. was removed from regular class for several subject areas in favor of a specific classroom for individualized attention.

*J.B.'s Transfer to North Hudson Academy*. In a letter dated May 1, 2007, to Harvey Rifkin (supervisor of the Newark Board of Education Office of Special Education), Robyn Dawson (GNCS's Social Services Department chairperson) requested that J.B. be placed in North Hudson Academy. P-2. Attached to this letter were several forms. The "Justification for Out-of-District Placement/Home Instruction" form, dated May 10, 2007, stated that J.B.'s behavior was "very poor" and that he was "in need of a more intensive program," specifically, the North Hudson Academy. The "Notification of Placements" form, also dated May 10, 2007, stated that J.B.'s District of Residence is the Greater Newark Charter School, and that the North Hudson Academy would be the receiving-school placement. J.B. was to be placed at the receiving school "ASAP," but the "Date of student's first day of attendance" was left blank. Also included was a fax from North Hudson Academy, dated May 10, 2007, accepting J.B. for the 2006-2007 school year. This letter stated that "[North Hudson Academy] will be in contact with the district to complete the Tuition Contract Agreement." In a letter from an attorney for Newark Public Schools to petitioner's attorney, it is made clear that "Newark Public Schools assumed financial responsibility [for the North Hudson Academy placement] pursuant to N.J.S.A. 18A:36A-11(b)."

A Newark Public Schools "SERS Student Information Form" was submitted on May 23, 2007, requesting that Newark Public Schools provide transportation from J.B.'s home in Newark to the North Hudson Academy.

*J.B.'s Domicile Change*. On August 1, 2007, J.B.'s mother, E.M., entered into a lease in East Orange, New Jersey. R-2. J.B.'s mother subsequently made an appointment with the East Orange School District to "transfer [J.B.'s] documentations to the East Orange School District, in order to secure his transportation voucher." P-1. J.B.'s mother notes, "[t]his was intended to be a simple transfer of transportation assistance, due to residence change." Id. At a September 4, 2007, meeting, J.B.'s mother provided East Orange with J.B.'s birth

certificate, J.B.'s immunization record, a copy of her license, and a copy of her lease. R-2. Also at this meeting, J.B.'s mother filled out a registration form, on which she listed North Hudson Academy as J.B.'s former school twice. R-3. She also completed a health services questionnaire, a medical consent form, and an emergency card. R-3; R-4.

*East Orange's Subsequent Actions*. A letter dated October 10, 2007, from Tonya H. Santos, the East Orange Special Education Services director, recounted the September 4, 2007, meeting. (R-5). Ms. Santos stated that East Orange notified E.M. that they intended to place J.B. in an in-district program consistent with the "current IEP developed by The Greater Newark Charter School [that] identifies resource in-class support as the prescribed program to meet his needs." R-5. Ms. Santos also recounted that this notification prompted E.M. to "reveal" the out-of-district program that GNCS had implemented, and that "[n]one of [her] transfer documentation noted this placement." R-5. Note that North Hudson Academy is listed twice on the East Orange registration form. R-3. Ms. Santos concluded,

> At this time we are notifying you that your son's placement with [sic] be at Sojourner Truth Middle School, in grade 6. There he will receive in-class support services as noted in his IEP. If you would prefer a self-contained behavioral disability program, his IEP would need to be revised to reflect the new program.

[R-5.]

The original IEP on which Ms. Santos bases this placement clearly described the location of J.B.'s reading, language, and math classes as "Skill Center," whereas social studies, science, and art/music/gym were located in regular class. R-1 at 31. The language "in-class support" was used only once in the original IEP, and that was on the first page under J.B.'s date of birth and above his address. R-1 at 1. When the "Program: In-class support" was described in the thirty-three pages that followed, the description was clearly that of the "self-contained behavioral disability program" that Ms. Santos opened for discussion at the end of the October 10 letter. R-5. Therefore, since J.B.'s IEP already included a self-contained program for several classes, Ms. Santos incorrectly stated, "[J.B.'s] IEP would need to be revised to reflect the new [self-contained behavioral disability] program." R-5.

Exhibit R-6 displays Newark Public Schools' confirmation that J.B.'s school was "North Hudson Academy through Greater Newark Charter School," and that "the student has been terminated from the [North Hudson Academy through Greater Newark Charter School] placement due to" J.B.'s transfer to East Orange public schools. R-6. This notice was sent to "Principal" and dated/effective September 5, 2007. R-6.

Exhibit P-3 indicates that the Greater Newark Charter School continued to view J.B. as an enrolled student. This "Annual Review" of J.B.'s IEP lists the same case manager and child study team member as the original IEP. However, the IEP lists two new participants, a special education teacher and a school representative, who do not appear on the faculty or administration lists posted on the GNCS website. These are likely North Hudson Academy employees that were present at the meeting in accordance with IEP team requirements.

### discussion

Charter schools are a relatively new educational institution in the state of New Jersey. The Charter School Program Act of 1995 ("Charter School Program Act") states, "[a] charter school shall be a public school operated

under a charter granted by the commissioner, which is operated independently of a local board of education and is managed by a board of trustees." N.J.S.A. 18A:36A-3. These schools "promot[e] comprehensive educational reform by providing a mechanism for the implementation of a variety of educational approaches which may not be available in the traditional public school classroom." N.J.S.A. 18A:36A-2. Because of the benefits charter schools provide, it is official State policy "to encourage and facilitate the development of charter schools." Ibid.

The Charter School Program Act requires that "[a] charter school shall be open to *all* students on a space available basis . . . ." N.J.S.A. 18A:36A-7 (emphasis added). The only initial-enrollment limitation is the Charter School Program Act's mandatory preference for students who reside in the district in which the charter school is located, N.J.S.A. 18A:36A-8(a), but charter schools may admit non-resident students if there is space available. N.J.S.A. 18A:36A-8(d). Finally, "[a] charter school shall allow any student who was enrolled in the school in the immediately preceding school year to enroll in the charter school in the appropriate grade unless the appropriate grade is not offered at the charter school." N.J.S.A. 18A:36A-8(b).

The sole charter school enrollment prerequisite is that "the student must first be registered in the school district in which the student resides." N.J.A.C. 6A:23-9.5(a). This requirement facilitates the administrative process, because "[f]or any student who applies for enrollment in a charter school, a district board of education in which the charter school applicant resides shall process the registration of the student for the subsequent school year upon submission of the registration forms." Ibid. These registration forms include both "assessment of residency and the subsequent transfer to the charter school." Ibid. As such, it is the district, not the student, who is responsible for "process[ing] in a timely manner" all registration and transfer documents related to the charter school. Ibid. Registration in the local district determines what school district funds the public yet legally separate charter school.

Charter school funding occurs through a statutorily outlined allocation process. Specifically:

> The school district of residence shall pay directly to the charter school for each student enrolled in the charter school who resides in the district an amount equal to 90% of the sum of the budget year equalization aid per pupil and the prebudget year general fund tax levy per pupil inflated by the CPI rate most recent to the calculation.
>
> [N.J.S.A. 18A:36A-12(b).]

There is an issue of which definition to apply to "district of residence" for this portion of the Charter School Program Act. "Residence," under N.J.S.A. 18A:1-1, "means domicile, unless a temporary residence is indicated." This definition indicates that East Orange would be responsible for funding J.B.'s charter school enrollment. However, "district of residence," under N.J.A.C. 6A:11-1.2, "means the school district in which a charter school facility is physically located." This definition indicates that Newark Public Schools is responsible for funding J.B.'s charter school enrollment, regardless of where he is domiciled.

Further, if the responsible district receives aid for categorical programs, including special education, the district must pay the charter school "the amount that is attributable to each resident student enrolled in that charter school who participates in the categorical programs . . . ." N.J.A.C. 6A:23-9.5(c), promulgating N.J.S.A. 18A:36A-12(b). If a charter school student "was not included in the district's projected resident enrollment for

the school year, the State shall pay 100% of the amount required pursuant to [N.J.S.A. 18A:36A-12(b)] for the first year of the student's enrollment in the charter school." N.J.S.A. 18A:36A-12(d).

Consistent with their public school nature and allocation of categorical special education aid, charter schools must comply with "New Jersey statutes concerning the provision of services to handicapped students." N.J.S.A. 18A:36A-11(b). "New Jersey's special education regulations are intended to fulfill the state's responsibilities under IDEA." Montgomery Twp. Bd. of Educ. v. S.C. ex rel. D.C., 2007 U.S. Dist. LEXIS 6071, 3-4 (D.N.J. Jan. 26, 2007), citing N.J.A.C. 6A:14-1.1(b)(1). As such, a charter school must provide any enrolled disabled students with a "free, appropriate public education" (FAPE) consistent with the Individuals with Disabilities Education Act, New Jersey Statutes, and all implementing regulations. N.J.A.C. 6A:11-4.8. Thus, the responsibility of developing an individualized program that confers a meaningful educational benefit shifts from the district of residence to the charter school. As such, "charter schools have their own [child study teams] as well as the authority to conduct evaluations, develop IEPs, and determine educational placements for disabled students." Asbury Park Bd. of Educ. v. Hope Acad. Charter Sch., 278 F. Supp.2d 417, 420 (D.N.J. 2003). However, FAPE via New Jersey charter schools is conceptually different from the typical IDEA FAPE obligations because the charter school receives its funding through public school districts on a per-pupil basis. See N.J.S.A. 18A:36A-12(b). Therefore, the *source* of the "free" requirement of an "appropriate public education" remains with the district because it passes public funds to the charter school pursuant to the statute and implementing regulations. As such, in the case at hand, once J.B. enrolled in the Greater Newark Charter School, the GNCS was required to provide J.B. with an FAPE subject to the procedural and substantive requirements of federal and state laws and regulations; but the "free" aspect of the education is still *dependent* upon the district in which J.B. is domiciled.

Although charter schools are required to provide their students with FAPE pursuant to these state and federal standards, the Charter School Program Act carves out one specific exception to the "free" special education requirement. If a charter school's child study team determines that an appropriate education can only be provided in a private day or residential school, then the fiscal responsibility of such a program remains with the district of residence. N.J.S.A. 18A:36A-11(b). Prior to the Charter School Program Act's recent amendments, the only challenge a district of residence could make was via N.J.S.A. 18A:36A-15, which states, "[a]ny individual or group may bring a complaint to the board of trustees of a charter school alleging a violation of the provisions of this act. If . . . the individual or group determines that the board of trustees has not adequately addressed the complaint, they may present that complaint to the commissioner . . . ."

This requirement was recently amended to allow the district of residence to challenge the charter school child study team (CST) placement decision. Effective January 13, 2008, "[w]ithin 15 days of the signing of the [IEP], a charter school shall provide notice to the resident district of any [IEP] which results in a private day or residential placement." N.J.S.A. 18A:36A-11(b). The resident district then has 30 days to challenge the placement "in accordance with the procedures established by law." Ibid. This language was recently interpreted by ALJ McKeown, who stated, "the procedures for challenging actions authorized within [New Jersey Education Law, N.J.S.A. 18A:1-1, et seq.] are set out at N.J.S.A. 18A:6-9, *Controversies, disputes arising under school law, jurisdiction*." Garfield Bd. of Educ. v. T.C. and D.C. and Bergen Arts and Science Charter School o/b/o J.C., EDS 3508-08, Final Decision (May 7, 2008) <http://njlaw.rutgers.edu/collections/oal/search.html>. ALJ

McKeown continued, "the challenge is to be made by the resident board of education filing a petition of appeal before the Commissioner of Education . . . ." Ibid.

In Garfield, supra, EDS 3508-08, Final Decision (May 7, 2008) <http://njlaw.rutgers.edu/collections/oal/search.html>, the resident district refused to pay for a private placement decided upon by a charter school CST and J.C.'s parents. Specifically, the resident district sought a "due process hearing under the [IDEA] to demonstrate it has a program in effect in its district that would provide J.C. with an education appropriate to his needs." Ibid. The district noted "that a recent amendment to N.J.S.A. 18A:36-11b authorizes it, as the resident district, to challenge the placement of a student for whom it retains fiscal responsibility within thirty days in accordance with the procedures established by law." Ibid. Conversely, the parents and charter school argued, "once they enrolled J.C. in a charter school, it became the responsibility of the charter school and its IEP team, along with them, the parents, to develop an IEP and determine the placement appropriate to meet his needs." Ibid. Further, the parents contended that the amendment to N.J.S.A. 18A:36-11(b) authorizes a resident district to challenge a placement by filing a petition before the Commissioner of Education "under authority of N.J.S.A. 18A:6-9 to hear and determine controversies and disputes arising under school law." Ibid. This argument reserves IDEA due process hearings for controversies related specifically to IEP formulation, not placement discrepancies between schools.

ALJ McKeown concluded that N.J.A.C. 6A:14-2.7 "plays no role in situations such as here when a student is enrolled in a charter school but the resident board retains fiscal responsibility for that child." Ibid. As such, a clear line exists between the responsibility to provide a meaningful education pursuant to federal law and the responsibility to finance a meaningful education under state law. Therefore, an appeal before the Commissioner of Education was proper, not a due process hearing. Ibid. "Free" is the responsibility of the resident board under the Charter School Program Act, and "Appropriate Public Education" is the responsibility of the charter school, which receives its funding via the resident board accordingly. Ibid.

ALJ McKeown further noted, "the availability of an in-district program has no bearing on the Board's fiscal responsibility for the placement determined to be appropriate by J.C.'s IEP team. Nor, can the existence of an in-district program be the basis of finding existing placement to be inappropriate." Ibid.

In Asbury Park, two classified students from the same district (Asbury Park) were enrolled in separate charter schools. Asbury Park, supra, 278 F. Supp. 2d at 420. "The charter schools then transferred the students, without consulting the school district, to private schools and sought reimbursement from the school district, pursuant to the Charter School Act's IDEA provision." Ibid. The district subsequently challenged the placement decision made by the charter schools. The court held, "the school district does not have the right to challenge the students' placement under the IDEA." Ibid. The court reasoned that the district had no right of action under the IDEA. No express right of action existed because the "IDEA only provides an express private right of action to parties aggrieved by underlying administrative proceedings in a dispute over a particular child." Id. at 422, n.3. No implied right of action exists because "the individuals for whose `especial benefit the [IDEA] was enacted' are disabled children and their parents." Id. at 422, citing 20 U.S.C. § 1400(c), (d); H.R. Rep. No. 105-95 (1997), reprinted in 1 997 U.S.C.C.A.N. 78, 79-82. The court further reasoned, "because Congress expressly provided a private right of action in favor of any party aggrieved by underlying administrative proceedings in a dispute over a particular child, it is unlikely that Congress intended to provide a private right of action in the absence of such

underlying proceedings." Id. at 422. Despite the denial of an IDEA action, Asbury Park was pointed to other judicial mechanisms for redress. Specifically, "the Charter School Act provides a comprehensive scheme for `any individual or group' to bring complaints `alleging a violation of [its] provisions.'" Ibid., quoting N.J.S.A. 18A:36A-16. Although this state design bars federal relief "for resolving disputes between school districts and charter schools," it nonetheless provides an outlet for resident districts to appeal charter school special education private placements, now subject to a 30-day challenge period. See N.J.S.A. 18A:36A-11(b).

With regard to J.B.'s placement, it is not clear from the evidence presented exactly *how* J.B. was placed at the North Hudson Academy under his then current IEP. Under the IDEA's procedural safeguard heading, 20 U.S.C.A. § 1415(b)(3) requires an agency to provide prior written notice to parents when the agency proposes to change the educational placement of the child. No such notice has been revealed to this tribunal, indeed, J.B.'s IEP was not amended to reflect the North Hudson Academy placement until five months after the placement had occurred, and well after the September 4, 2007, meeting at East Orange. P-3.

J.B.'s placement at North Hudson Academy was appropriate and in accordance with IDEA individualized education requirements for several reasons. First, J.B.'s mother's insistence that J.B. continue his placement at North Hudson indicates that no procedural consent/notice requirement has been substantially violated. Second, GNCS's "Justification for Out-of-District Placement/Home Instruction" form makes it undisputed that J.B. was placed in the North Hudson Academy in May 2007 by GNCS, which was the agency responsible for implementing J.B.'s federal and state special education requirements. Since the GNCS child study team's placement is clearly supported by J.B.'s mother, the change in placement appears both appropriate and consensual for practicality purposes. Third, Newark Public Schools assumed financial responsibility for the North Hudson Academy placement. Thus, Newark's adherence to N.J.S.A. 18A:36A-11(b) reflects the proper legal separation of federal IDEA placement requirements and state Charter School Program Act financial requirements. Because the Greater Newark Charter School's CST and J.B.'s mother agreed that a private placement was necessary for J.B. to achieve a free and appropriate public education, procedural safeguard failures (including subpar document updating) cannot be deemed substantial for purposes of invalidating an individualized education program's placement.

East Orange's argument that J.B. severed ties to GNCS when he was registered on September 4, 2007, fails because of continuing FAPE obligations by a sending school, the wording of the Charter School Program Act, and the administrative duties the implementing regulations place on domicile-districts. Under the IDEA, a private placement does not eliminate the CST's FAPE responsibilities owed to a classified student. 20 U.S.C.A. § 1414(d)(4)(A)(i) (a CST is required to perform "reviews [of] the child's IEP periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved"). As such, the program at North Hudson Academy was providing J.B.'s meaningful education, but responsibility of ensuring, evaluating, and continuing to provide that meaningful education remains with the GNCS until J.B. is no longer enrolled in the Charter School.

FAPE continued to be GNCS's responsibility because J.B.'s ability to reenroll at GNCS was not terminated by his subsequent registration in the East Orange district. First, a charter school student must be enrolled in the district in which he is domiciled. N.J.A.C. 6A:23-9.5(a). Second, GNCS would not be allowed to terminate J.B.'s enrollment solely because he transferred districts once he was already enrolled in the charter

school. "A charter school shall allow *any* student who was enrolled in the school in the immediately preceding school year to enroll in the charter school in the appropriate grade . . . .." N.J.S.A. 18A:36A-8(b) (emphasis added). There are no exceptions listed for this preference, and the GNCS charter adopts this requirement. See <http://greaternewarkcharterschool.org>. Although this enrollment hierarchy is questionable, as is evident by the cost considerations of the current dispute, the statute clearly gives enrollment preference to previously enrolled charter school students without exception. Therefore, district residency change does not preclude reenrollment under the current wording of the statute.

Lastly, the statutory reenrollment and enrollment preference logically combines with resident district administrative responsibilities. Specifically, the "district board of education in which the charter school applicant resides" is responsible for "process[ing] the registration of the student for the subsequent school year upon submission of the registration forms." N.J.A.C. 6A:23-9.5(a). Processing includes "the assessment of residency and the subsequent transfer to the charter school . . . ." Ibid. The Charter School Program Act disseminates duties on resident districts by grouping the administrative functions of registration and transfer processing. Because charter school programs are not structured like regular public schools, registration and transfer forms must be processed on a more regular basis. As such, the meaning of "registration" does not per se indicate that the resident district is assuming education responsibilities for a student, including FAPE. "Registering" in a new resident district is an administrative step required under the Charter School Program Act that does not necessarily transfer FAPE obligations. Instead, registration points to the issue of fund allocation pursuant to the state laws that established public education, including public charter schools. Therefore, the Charter School Program Act indicates that the registration process that occurred on September 4 did not automatically trigger East Orange's IDEA duties because registration is a mandatory step for charter school transfer.

Based on the facts presented, it is clear that Newark Public Schools, Greater Newark Charter School, or both, failed to transmit the proper information to East Orange, failed to properly document the private placement, or both. Regardless, it is well established that local education agencies do not have an express nor an implied right of action under the IDEA. Rancocas Valley Reg'l High Sch. Bd. of Educ. v. M.R., 380 F. Supp.2d 490, 495 (D.N.J. 2005), citing Lawrence Twp. Bd. of Educ. v. N.J., 417 F.3d 368 (3d Cir. 2005). The third circuit recently agreed with the second circuit, which reasoned:

> Since Congress expressly provided a private right of action in favor of certain groups, specifically, any party aggrieved by particular findings or a decision rendered under [20 U.S.C. § 1415(i)(2)(A)], but did not expressly provide a private right of action in favor of a county, educational agency or any other entity seeking to challenge the lack of an interagency agreement required by § 1412(a)(12), we find it extremely unlikely that Congress intended to do so.
>
> [Lawrence, 417 F. 3d at 372 quoting County of Westchester v. New York, 286 F.3d 150, 152 (2d Cir. 2002); see also Asbury Park, supra, 278 F. Supp.2d 417.]

Petitioners initiated this due process hearing under peculiar legal circumstances. Specifically, petitioners proved that respondent's reliance on the IDEA for in-district placement was incorrect because of its intricate application within the Charter School Program Act. To prove this, petitioners had to initiate the due process hearing via the same statute they claimed was inapplicable to respondent's self-imposing FAPE obligation claims. This creates a scenario for an exception to the general rule because East Orange becomes a party "aggrieved by the outcome of underlying administrative proceedings in a dispute over a particular child. . . ."

Asbury Park, supra, 278 F.Supp. 2d at 422. However, as discussed above, the Charter School Program Act applied the IDEA's appropriate public education requirement to GNCS only, while the Newark Public Schools were responsible for ensuring that the appropriate public education provided by GNCS was free for the 2006-2007 school year. As such, any procedural failures by GNCS and/or Newark Public Schools that aggrieved East Orange occurred by and through the Charter School Program Act. As such, any private right of action East Orange may seek should be addressed through the channels made available via the Charter School Program Act. See Garfield, supra, EDS 3508-08, Final Decision (May 7, 2008) <http://njlaw.rutgers.edu/collections/oal/search.html>. Regardless of East Orange's future actions, the administrative failures of either the Newark Public Schools or GNCS do not prohibit J.B. from attending the placement appropriately deemed proper under IDEA standards. Whether East Orange can successfully challenge or seek redress for administrative failures is an issue for the Commissioner or the Legislature, not an IDEA due process tribunal.

     Finally, it should be noted that East Orange's argument that it satisfied the general requirements of N.J.A.C. 6A:14-4.1 should fail because of the procedural inadequacies in its intake process. Under N.J.A.C. 6A:14-4.1(g), an intrastate transfer requires that districts perform "an immediate review of the evaluation information and the IEP and, without delay, in consultation with the student's parents, provide a program comparable to that set forth in the student's current IEP until a new IEP is implemented . . . ." N.J.A.C. 6A:14-4.1(g). To appropriately perform this administrative requirement, the new school district "*shall* take reasonable steps to promptly obtain the student's records, including the current IEP and *supporting documentation*, from the previous school district in accordance with N.J.A.C. 6A:32." N.J.A.C. 6A:14-4.1(g)(3) (emphasis added). Based on East Orange's insistence that the October 25, 2006, IEP is the last valid IEP, it can be inferred that East Orange did not obtain J.B.'s IEP supporting documentation. See N.J.A.C. 6A:14-4.1(g)(3). This presents an issue regarding who is responsible for the P-2 documents not reaching East Orange.

     In a letter from Mr. Zartarian, Esq., to Ms. Canty-Barnes, Esq., Newark Public Schools produced detailed placement forms regarding GNCS's placement of J.B. in the North Hudson Academy. P-2. Clearly, East Orange did not perform its registration process in a thorough manner. N.J.S.A. 18A:36-25.1(b) states, "[w]hen a child transfers from one school district to another, the receiving school district shall obtain the child's school record from the district from which the child has transferred, within 14 days of enrollment." East Orange knew that J.B. was a student registered in the Newark Public Schools and that he was attending the North Hudson Academy by way of the Greater Newark Charter School. R-6. Further inquiry with any of these entities would have revealed more details of J.B.'s appropriate education, and such inquiry is mandatory under N.J.S.A. 18A:36-25.1(b) and N.J.A.C. 6A:14-4.1(g)(3).

     Further, the requirements East Orange relies upon require the district to consult with J.B.'s parents to provide the appropriate IEP. N.J.A.C. 6A:14-4.1(g). It stands to reason that if performed properly this administrative requirement would have revealed the extent of the discrepancy currently before this tribunal, which would have led to East Orange contacting Newark Public Schools or the Greater Newark Charter School to solve the issue accordingly. Regardless, these failures are all unrelated to J.B.'s free and appropriate education because the responsibility of ensuring this program never ceased to remain with GNCS. If it had, "[t]he lead person of [the] charter school [would be required to] forward to the district board of education . . . records of a student transferring from the charter school in accordance with N.J.A.C. 6A:32-7." N.J.A.C. 6A:11-4.2(b).

**conclusion**

  Because of the wording of the Charter School Program Act and its implementing regulations, J.B.'s status as a GNCS student was never terminated per se. Charter schools are required to reenroll *any* student. N.J.S.A. 18A:36A-8(b). This does not indicate any restrictions due to the student's domicile. Since GNCS is responsible for providing J.B. an FAPE and "registration" is a statutory requirement for charter school enrollment, the Charter School Program Act controls and East Orange does not have an IDEA right of action against J.B., including mandating in-district placement after a registration meeting. If East Orange had properly obtained IEP supporting documentation, East Orange would have noticed the private placement and inquired further with J.B.'s mother, Newark Public Schools, the Greater Newark Charter School, and North Hudson Academy. If a discrepancy was still at hand after performing the appropriate transfer protocols, East Orange should have proceeded according to N.J.S.A. 18A:6-9, *Controversies, disputes arising under school law, jurisdiction*. Garfield, supra, EDS 3508-08, Final Decision (May 7, 2008) <http://njlaw.rutgers.edu/collections/oal/search.html>.

  Despite East Orange's contentions, "the availability of an in-district program has no bearing on the Board's fiscal responsibility for the placement determined to be appropriate by [the] IEP team." Garfield, supra, EDS 3508-08, Final Decision (May 7, 2008) <http://njlaw.rutgers.edu/collections/oal/search.html>. East Orange has no authority to prevent J.B. from enrolling and/or remaining enrolled in the GNCS, and therefore can not be afforded any relief in an IDEA due process hearing. The complaint should involve Newark Public Schools (the issue of "district of residence"), the Greater Newark Charter School (retroactive challenge of the North Hudson Academy placement), and/or the New Jersey Department of Education (reimbursement for an unforeseen student enrolled in a charter school). The Charter School Program Act of 1995 delegates substantive IDEA education program requirements to the charter school in which a disabled student is enrolled, and as such, J.B.'s placement at the North Hudson Academy was appropriate. East Orange improperly claimed that it was responsible for providing J.B. with an appropriate education, and this tribunal is not the proper forum to challenge J.B.'s placement and/or costs.

This decision is final pursuant to 20 U.S.C.A. § 1415(i)(1)(A) and 34 CFR § 300.514 (2007) and is appealable by filing a complaint and bringing a civil action either in the Law Division of the Superior Court of New Jersey or in a district court of the United States. 20 U.S.C.A. § 1415(i)(2); 34 CFR 300.516 (2007).

DATE **LESLIE Z. CELENTANO,** ALJ

da

Respondent cites <http://www.greaternewarkcharterschool.org> in its June 12, 2008, opposition to petitioner's motion for summary decision.

This is likely a typo because the accompanying materials are dated May 10, 2007.

"Courts must strictly scrutinize IEPs to ensure their procedural integrity. Strictness, however, must be tempered by considerations of fairness and practicality: procedural flaws do not automatically render an IEP legally defective. Before an IEP is set aside, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." Roland M. v. Concord School Dep't, 910 F.2d 983 (1st Cir. 1990) (citations omitted).

For example, GNCS started as one single grade. See <http://greaternewarkcharterschool.org/>.

OAL DKT. NO. EDS12493-07

17

*New Jersey is an Equal Opportunity Employer*

This archive is a service of Rutgers University School of Law - Camden.